[Civ. No. 8234. Third Dist. Sept. 28, 1953.]

JOHN W. SKELTON et al., Respondents, v. AGNES FEKETE et al., Appellants.

Taft, Wright & Hopkins and Gerald M. Desmond for Appellants.

Albert H. Mundt for Respondents.

VAN DYKE, P. J.—On November 17, 1950, an accident occurred upon a public highway in Sacramento County involving a truck and trailer, then owned and operated by Vincent Graffio, and a passenger car driven by respondent Dorothy Skelton, wife of respondent John W. Skelton. Action was filed by respondents against appellant Graffio and also against appellant Agnes Fekete doing business under the name of Segundo Trucking Company. We shall hereafter refer to her as Fekete. It appears that Graffio was hauling lumber for Fekete under a contract which Fekete says established the relationship of employer and independent contractor between them so that Fekete was not liable for Graffio's alleged tort. A jury returned a verdict of $40,000 against both defendants and they have each appealed.

We shall first treat of the contention of appellant Fekete that there is no substantial evidence to support the finding of the jury that Graffio was her servant. In her opening brief Fekete has set forth in question and answer form all of the testimony bearing upon the relationship between herself and Graffio and respondents do not contend that the statement is not complete. The statement of testimony in question and answer form occupies more than 80 pages of Fekete's brief. We will state the testimony in narrative form, eliminating duplication. There were two witnesses, and in addition to their testimony there was in evidence the written contract which Fekete claimed to have been the one under which Graffio was operating.

Defendant Graffio testified as follows:

He owned the truck and trailer which on November 17, 1950, was involved in the accident. He was carrying a load of lumber which he had picked up at Susanville on the 16th. Doris Martin, manager for Fekete, had sent him for the load. On the morning of the 15th he had called her and inquired for hauling. He went to Fekete's office to get the manifests so he could receive the load. He signed a contract. (This contract was placed in evidence.) Doris Martin told him to bring the load back to Los Angeles and she would tell him what to do with it. He had to come back to Los Angeles for these further instructions. On delivery of the manifests

to the Lassen Lumber Company their employees loaded the rig and he receipted for the load. After the accident he called Doris Martin in Los Angeles and reported it. Lumber was on the side of the road and the patrol told him to move it off. He called Doris Martin so she could send out another truck. He had instructions to report accidents to Fekete. Doris Martin told him to stand by. She sent Ollie Miller's personal truck. A hoister hired at Sacramento was used to pick up the load; he billed that charge to Fekete because he had no money to pay for it, but the charge came out of his earnings. He had done similar hauling for Fekete over a period of about nine months, beginning around April. During none of the period did he own more than one truck at a time and during that period he only hauled one load for others than Fekete. He had no other income except from hauling. When assigned to make the trip to Susanville he received his instructions at home. He had been told to call up as a load might be ready and when he did Mrs. Martin asked if he wanted to go to Susanville. His home is his place of business. If he doesn't have much to do he goes to the office of Fekete. If he didn't go on a particular morning and there was a load to pick up Mrs. Martin would call him. Most of the time he went to the office whether he had a haul for that day or not. When he had no haul he took care of his rig. He had an understanding with Mrs. Martin that he would report to the office every day when not on the road. There were quite a few others hauling for Fekete. He could not recall there ever was a meeting of these men called by Fekete during which they were given instructions and rules and regulations and he never worked under rules and regulations issued by Fekete or anyone in charge there. They never told him how he should conduct himself on the road; no rules or regulations were issued by Fekete covering the activities of drivers. He received checks for hauls on the average of about once every two weeks, not necessarily on regular dates. When they would collect for a haul then they would give him a check. He would have followed, in relation to any of these hauling jobs, any instructions Doris Martin gave him. While on a trip if she had called him and told him to go some place else he would have to do it for the simple reason that he was out to get a load of lumber so he could make a living. If she had sent him to Susanville and then called him and told him not to go to Susanville but to

go to Redding he wouldn't have had to do it, but he would do it provided there was a load of lumber there for him.

Mrs. Doris Martin testified as follows:

She was the dispatcher for Fekete and took care of the office and engaged the truckers. The Segundo Trucking Company was a trucking company and hauled lumber almost exclusively. When she sent Mr. Graffio to Susanville she told him to go up there and pick up a load of lumber and return it to Los Angeles and she would give him further instructions as to what he should do with it at that time. Fekete owned one line rig, and five small Fords that handled lumber locally in Los Angeles. A line rig is one that goes on long hauls on an operation similar to that being engaged in by Graffio. Fekete's own line rig driver was paid 25 per cent of the net haul and Fekete supplied the gas and oil. The driver was on Fekete's payroll and Fekete paid social security, withholding and compensation. When the line rig went for a load of lumber the driver came back to Fekete's office and then he took it out to its final destination under instructions. Graffio was paid 86¾ per cent of the net pay for the haul. He supplied his own gasoline and oil and his own truck and was paid whenever Fekete got a check for the load that he had hauled. Graffio was never on the payroll. Fekete never contributed for him to social security nor to the California unemployment benefits, nor carried compensation insurance on him, nor made income tax deductions from money paid him. Fekete had subhauler agreements with him. In April, 1950, these were oral agreements, roughly around a dozen, but after the first of June there were written agreements. There were approximately 70 subhaulers, but not at one time. There were 70 different operators that owned their own trucks that hauled for Fekete, as many from time to time as there was use for. When the load was spilled in the accident she sent Ollie Miller with his truck to bring the load on to Los Angeles. She gave him no directions or instructions other than to tell him where the load was to be picked up and where it was to be taken. Any directions or instructions given to Graffio or any other subhauler to report an accident would be for the reason Fekete was interested in the trucking business and in the cargo because responsible for it. They were not actually instructions to report accidents. It was just a common thing to notify them if there was an accident. For Fekete's own line rig there were different places where the driver could purchase gas and oil and such

necessities, but the men who were subhauling, including Graffio, fueled wherever they wanted to and Fekete had no control over it. When Fekete's own line rig driver had no haul his time was his own, but he was to report to the office every morning or she would call him in. He signed no contracts, was paid once a week according to the trips he had made. He was paid for making repairs or cleaning the rig on an hourly basis. The subhauler contracts were prepared for the purpose of maintaining a record of trips as they related to a particular individual. Before written agreement forms were used there were oral agreements with subhaulers, but they were to the same effect. Fekete never at any time called the subhaulers together for discussions relative to the operation of the subhauling agreements, and never posted rules and regulations on the bulletin board governing their activities. The subhauler agreements with Graffio were a standard form. They were printed especially for such use and had been prepared by an attorney at Fekete's request.

The provisions of the written contract signed by Graffio when he appeared at Fekete's office before starting on his trip to Susanville may be summarized as follows: Graffio agreed to transport lumber by truck owned and operated by him from Susanville to Hollywood. He was to receive as compensation a portion of Fekete's gross receipts from the haul payable within 15 days after the merchandise had been delivered and weight tickets and delivery receipts from the customer had been returned to Fekete. Graffio agreed to maintain his vehicle in good condition and working order, to pay all operating expenses, including gasoline and fuel and wages of the driver, to furnish tarps of sufficient size and weight to completely cover the load and protect it from storm damage and to furnish chains, binders and ropes. Graffio agreed to carry the merchandise to place of delivery and to be liable to Fekete and to the cargo owner as an insurer for any loss or damage to the merchandise transported. He warranted he would maintain insurance on the vehicle against public liability and property damage, fire and collision throughout the trip covered by the agreement. It was specifically agreed that the written document established a "contractual" relationship between the parties and that neither Graffio nor any of his agents or employees should at any time be considered employees of Fekete, but that Graffio should at all times be considered an independent contractor. Graffio agreed on request of Fekete to furnish certificates

of insurance as. evidence he had maintained in force such workmen's compensation, public liability and other insurance as he was required to carry under the laws of this state, and it was further agreed that Graffio should conclusively be deemed to be in exclusive control of the vehicle and equipment until all merchandise had been removed at destination; and that if he did not complete delivery Fekete could provide a driver and vehicle to complete such delivery to the consignee, the cost to be borne by Graffio and the driver so provided to be Graffio's employee.

 An independent contractor is one who, in rendering services, exercises an independent employment or occupation, and represents his employer only as to the results of his work and not as to the means whereby it is to be accomplished; and when the essential object of the employment is the performance of work the relationship of master and servant does not exist unless the employer retains the right to direct the mode and manner in which the work shall be done. (*Lillibridge* v. *Industrial Acc. Com.*, 4 Cal.App.2d 237, 239 [40 P.2d 856].) An independent contractor is one who renders services for a specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which said result is accomplished. In distinguishing between the status of independent contractor and that of employee it is well established that a material and generally conclusive factor is the right of the employer to exercise complete and authoritative control of the manner in which the work is done. The existence of such right of control and not the extent of its exercise constitutes the relationship that of employer and employee. It has been said that no single circumstance is more conclusive to show this relationship than the right of the employer to end the service contracted for whenever he sees fit to do so. (*Baugh* v. *Rogers*, 24 Cal.2d 200, 206 [148 P.2d 633, 152 A.L.R. 1043].) "One of the best tests to determine whether the relation is that of an independent contractor or that of employer and employee is the right of control. It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent. . . . It is not a question of interference, or noninterference, not a question of whether there have been suggestions, or even orders, as to the conduct of the work; but a question of the right to act, as distinguished from the act itself or the

failure to act." (*Lillibridge* v. *Industrial Acc. Com., supra,* at page 240, quoting from *Hillen* v. *Industrial Acc. Com.,* 199 Cal. 577 [250 P. 570].) "It is important to distinguish between a servant and an agent who is not a servant, since ordinarily a principal is not liable for the incidental acts of negligence in the performance of duties committed by an agent who is not a servant. . . . The important distinction is between service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to accomplish results or to use care and skill in accomplishing results. Those rendering service but retaining control over the manner of doing it are not servants. . . . An agent who is not subject to control as to the manner in which he performs the acts that constitute the execution of his agency is in a similar relation to the principal as to such conduct as one who agrees only to accomplish mere physical results. For the purpose of determining liability, they are both 'independent contractors' and do not cause the person for whom the enterprise is undertaken to be responsible." (Rest., Agency, § 220, comment on subsection (1) c.)

When one in the prosecution of his affairs desires to obtain a specified result he is free to do so through employees subject to his direction and control as to their physical activities in aiding him to bring about the desired result or, on the contrary, to contract for the accomplishment of that result by another, surrendering in the meantime to that other all right to control him as to the means and manner by which he shall go about accomplishing the desired result. If he does the latter he is not liable for the uncommanded acts of the contractor. There are of course exceptions to this rule as where the person so desiring a result is charged with a nondelegable duty, but we are not here concerned therewith or with other exceptions. If, instead of working through his own employees, he so contracts with another to furnish him the desired result, he is not to be charged with seeking wrongly to evade responsibility to those who may be injured by that other in the performance of the work.

The problem of determining whether the status created by the arrangements made is that of employer and employee or that of principal and independent contractor is not to be approached from the standpoint that the law ought to cast upon the principal liability for injury to others in the

prosecution of his affairs through independent contractors. The law gives the right to elect and the election having been honestly made liability is not to be fixed by distortions of a clear contractual status honestly created.

 Applying what we have said to the facts narrated and in the light of the contract between Fekete and Graffio it is clear that Graffio was not the employee of Fekete, but an independent contractor for whose negligent performance of contractual obligations Fekete was not liable. Graffio owned his own line rig, which ownership involved investment of substantial capital. This equipment he maintained and operated and with it engaged in an independent calling which has become increasingly common as the growth of the state has made necessary a steadily increasing use of the public highways for the transportation of freight. He did not engage to drive this equipment himself when hauling loads for Fekete and he was free to employ a driver in his place if it suited his purposes from time to time to do so. The result he agreed to accomplish was a definite and concrete thing— the transportation of a load of lumber from point to point. With respect to that operation he undertook the usual obligations of a cargo carrier and so far as danger to the public was concerned through the operation of his equipment he undertook to carry public liability insurance. He was under no obligation, having completed a haul, to undertake another and was, in his relations to Fekete, but one of a great number of so-called subhaulers from time to time rendering like service to her. It is immaterial that he chose, without obligation to do so, to confine his hauling to Fekete's needs rather than to freeboot about the state. This was a business policy he was free to adopt. As said in *Hammel* v. *Keehn*, 18 Cal.App.2d 387, 390 [63 P.2d 1165] : ''There was . . . no contract continuing from day to day, but only a practice under which new contracts constantly arose.'' (See, also, *Clarke* v. *Hernandez*, 79 Cal.App.2d 414, 422-423 [179 P.2d 834].) Clearly the contract upon its face was for the accomplishment of a definite result through means and methods completely under the control of Graffio and without any reserved right in Fekete to exercise any control thereover.

 If we turn to the testimony touching the relationship we find nothing from which can be inferred a relationship other than specifically provided for by the written agreement nor any acts of the parties inconsistent therewith, not even any interference with Graffio's methods. True, Graffio was asked

what he would have done if, while engaged in a haul, he had received orders from Fekete to cease the performance of that contract and go to another place and haul other freight. But assuming that his testimony as to what he would have done in a purely supposititious situation would be competent proof as to the relationship between him and Fekete, he made it clear that though he would have done as requested, since he had a living to make, yet he would not have had to do it. Stress is laid upon the testimony that orders were given by Fekete's manager and dispatcher to Graffio, but these were no more than the usual orders that are given to any freight carrier as to point of origin and point of delivery—information necessary for the carrier to have if he is to perform his contractual obligations. There is no evidence that any order was ever given to Graffio even as to the route he was to follow, much less as to how his equipment should be operated. We think it unnecessary to labor the point further and that a consideration of the oral testimony and the written agreement demonstrates clearly that the relationship was that of principal and independent contractor and therefore that the judgment against Fekete is without substantial support and must be reversed.

We turn now to the appeal of Graffio. When this action was begun the complaint contained two counts, one in which Mr. Skelton was plaintiff and one in which Mrs. Skelton was plaintiff. Both counts contained allegations that at the time of the accident Graffio was operating his truck as the servant of Fekete. Trial to a jury resulted in a disagreement and thereafter the pleading was amended and the cause went to a second trial upon an amended complaint which contained an added count by each plaintiff alleging the following: That at the time of the accident Graffio was an independent contractor insofar as Fekete was concerned; that for a considerable period of time before he went on the trip which resulted in the accident he had been a reckless and negligent driver and that this fact was either known to Fekete or should have been known to her when she engaged him to make the haul. Although these counts so brought in by amendment purported to be against both defendants it is clear that as to Graffio they added no additional ground of liability and that they did add such a ground of liability as against Fekete. She was there being sued upon the theory that she herself had been negligent in selecting an independent contractor in that

she selected an incompetent one, that is, one who was such a reckless and incompetent driver that she might reasonably anticipate, knowing him to be such, that he might cause the very injuries sued for in this action and upon that ground she was liable for her own negligence. At the trial three special interrogatories were submitted to the jury: 1. Was Graffio at the time of the accident the employee of Fekete? 2. Was Graffio prior to the accident a negligent, careless and incompetent driver? 3. Was this either known by Fekete or of such degree that she should have known about it? The jury answered the first interrogatory by an affirmative finding that Graffio was the employee of Fekete. It did not answer the other interrogatories. Graffio in his appeal does not question that the evidence substantially supported the finding that on the occasion of the injuries sued for he negligently operated his truck, though it may be said that this evidence was sharply conflicting; but he urges that the court prejudicially erred in permitting questions to be asked him touching the cause of action based on the alleged negligence of Mrs. Fekete in selecting him as her contractor and that counsel for the plaintiffs was guilty of prejudicial misconduct and bad faith in the matter of these questions. He seeks reversal of a judgment which he contends was thus unfairly obtained. It appears that counsel for the plaintiffs, prior to bringing in his amendments to his pleadings, had obtained some information upon which he contends he was warranted in charging Mrs. Fekete with negligent selection. Before trial he sought to take the depositions of Graffio and of Mrs. Martin, manager for Fekete, and thereby to question Graffio concerning violations of the rules of safe driving which he believed Graffio to have been guilty of and to question Mrs. Martin as to what, if any, investigation Fekete had made concerning Graffio's competency as a truck driver. The witnesses had refused to answer questions of this sort and the matter had been reported to the court which had issued an order to them to show cause why they should not answer. The matter was at this stage when the cause came on for trial. There was a pretrial conference in the chambers of the trial judge, out of the presence of the jury panel, and with counsel present representing all parties. There the propriety of the questions was gone over and discussed, the limits of examination touching such matters was discussed and the trial judge informed counsel generally as to the conditions under which he would permit the questions to be asked and the limitations he would fix upon the examina-

tion of witnesses in respect thereto. It appears from the report of that meeting that counsel for the parties were at odds as to the legal sufficiency of the added counts and as to permissible methods of proof. Counsel for the plaintiffs took the position that he was entitled to prove his cause of action here under inquiry by calling Graffio to the stand as a witness and proving by specific instances of past misconduct that he was an incompetent driver; and then to prove directly, or by inference, that Fekete had or was charged with knowledge of such incompetence. There was much more in the discussions, but it is not necessary to state it here since we refer to the matter only to show that counsel on both sides, as well as the trial judge, had made considerable investigation as to what showing might properly be made upon examination of Graffio and of Mrs. Martin.

The trial proceeded and upon the matter we are now discussing Graffio was asked a number of questions, to which we will now give particular attention. He was asked if on February 10, 1948, in Los Angeles County, he had violated section 475 of the Vehicle Code by "running a red light." He denied he ran the light. He was asked what did happen. He explained that an amber light came on when he was halfway through an intersection and when he had cleared a police officer gave him a ticket. Nothing further appears concerning this suggested violation. He was asked if on August 16, 1948, in Los Angeles County, he had violated the Vehicle Code "by running a red signal." In effect he admitted he had. He was asked if on October 7, 1948, in San Bernardino, he had violated the code by passing on the right. He said he recalled no such incident. He was then asked this question: "I may refresh your memory that you were arrested by the California Highway Patrol Officer Smith and you entered a plea of guilty in the Justice's Court in the County of San Bernardino for that offense?" He said he could not recall the incident. The matter was dropped there. He was asked if he had been involved in an accident on May 28, 1949, in the City of Pomona and he said that he had been and that his truck had collided with an automobile. Nothing further was adduced concerning this incident to show Graffio was at fault. He was asked if on December 6, 1949, in Los Angeles County, he had violated the code by carrying an unsafe load. He said he did not have an unsafe load, then proceeded to say that an officer had stopped him and told him he was supposed to have three chains instead of two on the load he

was carrying under a law that had just gone into effect. He was then asked if he had entered a plea of guilty to such a charge in the justice's court and he stated he had. He was asked if on February 18, 1950, in Huntington Park he had violated the code by running a flashing red signal and if he had not been then arrested by Officer McBeaky. He explained that what he had said previously about running a red light on August 16, 1948, should be considered as about the incident of February 18, 1950, that being the only blinking light he could remember running through. He was asked again about the suggested incident of August 16, 1948. He said he could not recall it and counsel stated: "I might attempt to refresh your memory by stating that—asking you if you were not arrested by Officer Hoyt of the California Highway Patrol Number 796 on that date for that offense." He again stated he had no such recollection. He was asked if on April 28, 1950, in Kern County, he did not violate the code by overloading. He said he had not really overloaded but "he said I was overloaded and he gave me an overload ticket for that but I don't think I was" overloaded. Counsel then asked if he had not gone to the justice's court of Kern County and entered a plea of guilty and he replied he had. He was asked if on August 26, 1950, in Soledad, he had exceeded the speed limit with his truck. He said he didn't remember getting a ticket. Thereupon counsel said: "I might refresh your memory in that regard by asking you if you were not given a warning ticket by the Highway Patrol at that time?" He denied this. He was asked if on June 30, 1950, in Sacramento County, on Stockton Boulevard, he had violated the code by speeding with an excessive load. He replied he was not speeding and then went on to explain the incident during which a member of the patrol had given him a citation though he was not guilty. He was then asked if he had entered a plea of guilty of excessive speed at that time and he replied that "he paid the ticket." Asked if he had not gone "in to Judge Mix and entered a plea of guilty" he replied "I didn't go in; I mailed it in to him." He was asked if in September, 1950, in Los Angeles County, he had violated the code by driving at excessive speed. He said he had done so, but explained that he was approaching a steep grade, his motor was not functioning well and he picked up speed in order to make the grade, there being no traffic near. He was asked if he was involved in an accident in Bakersfield on July 30, 1950, and he denied that he had been, but explained that while he was

stopped off the road a car had struck his truck. He was asked if on October 18, 1950, in Los Angeles County, he had violated the code by driving through a safety zone while making an improper left turn and he answered that he had. He was asked if on October 17, 1950, in Tulare, he had violated the code by excessive speed. He replied he got a speed ticket but did not deserve it. He was then asked if he went into court and entered a plea of guilty and he replied he mailed the fine in. He was asked if he had been involved in an accident on June 3, 1946, in Los Angeles, where a person was involved and he stated he could not remember such an incident. He was asked if at any time he had discussed the matters concerning which he had been questioned with either Mrs. Fekete or Mrs. Martin or anyone in charge of Mrs. Fekete's business and he said he had not nor did he have knowledge that in any other way they had become acquainted therewith.

Mrs. Martin testified that when she dispatched Graffio to Susanville on November 17, 1950, she made no inquiry as to whether or not he was a careful driver or had ever violated state laws in respect of driving and that she had not communicated with the Department of Motor Vehicles concerning his record there. Counsel for the plaintiffs then called a witness who was familiar with the records kept in the state department as to violations by licensed drivers who stated that such records were kept, that they were public records and were open to inspection by anyone who desired to investigate them. There was a clear understanding between all counsel and the court that all these questions were under objection. And at the close of the testimony proper and adequate motions to strike were made and denied.

It is well settled that "One who employs an independent contractor to (a) do work which involves risk of bodily harm unless it is skillfully and carefully done, . . . is subject to liability for bodily harm caused by the failure to exercise reasonable care to employ a competent contractor." (2 Rest., Torts, § 411; see, also, *Ozan Lbr. Co.* v. *McNeely,* 214 Ark. 657 [217 S.W.2d 341, 8 A.L.R.2d 261], and the annotations appended to that report. It has been said also, and we think it is sound law, that in proof of allegations of such failure to exercise care general reputation may be shown if it is of such character as to warrant an inference of knowledge therefrom or that specific incidents of lack of care on the part of the contractor in pursuit of his business may be shown if they are sufficiently numerous and sufficiently

proximate in point of time to warrant an inference that any proper inquiry into the matter on the part of the proposed employer would have disclosed them. (*Ozan Lbr. Co.* v. *McNeely, supra,* and annotation thereto.) See, also, 2 Wigmore on Evidence, 3d ed., §§ 249, 250, from which we quote the following: "Where by the substantive law an employer's liability for injuries done by his employee depends upon his selection of a competent employee, it is well settled in all jurisdictions that the *reputation of the employee* is receivable to show that the employee's character in respect to competency was *known to the employer.* . . . Since reputation is after all created originally by conduct, the use of reputation, for the purpose just noticed, gives also, by implication, a sanction to the probative value of particular acts of misconduct as giving warning of incompetency." But appellant contends that, assuming these rules to be sound and applicable to his case, nevertheless by combination of bad faith in the asking of questions without reasonable belief that they would produce evidence of misconduct and with the intent instead to prejudice him by the mere asking and by reason of alleged errors in the introduction of the testimony that was elicited he was prevented from having a fair trial. To examine these assignments it is necessary to consider the situation and the implications therefrom which obtained at the trial. It was apparent that counsel for the plaintiffs had such information as the records of the Motor Vehicle Department disclosed as to past misconduct of Graffio; and therefore had had opportunity to prove such violations if any by the direct testimony of competent witnesses thereto. ▮ It is counsel's duty at all times to conduct a trial fairly. ▮ When counsel asked if Graffio had been involved in an accident and on receiving a negative answer adduced no other evidence upon the matter it could be inferred that in preparing his case for trial he had ascertained that he would be unable to prove the suggested violations of law by anyone other than Graffio and indeed in his brief counsel justifies his questioning of Graffio in that way by asserting that after all Graffio knew better than anyone else whether or not he had been driving on the dates and at the places referred to and had been guilty of misconduct in relation thereto. We incline to the opinion that if counsel so situated had asked these questions, the prejudicial character of which cannot be disputed, without any information whatever that the acts inquired about involved any wrongful act of Graffio's he would be fairly open to the accusations of unfair

tactics and of seeking merely to blacken Graffio in the eyes of the jury. But it appears in this record that he had sought an answer to these questions by deposition and Graffio had refused to answer and so we think it cannot be said with any sense of conviction that counsel was in these instances guilty of misconduct. Graffio contends further that the court erred, and counsel was guilty of misconduct, in the introduction of evidence concerning pleas of guilty; that counsel had also been derelict in those instances where Graffio had denied fault or stated that he failed to recollect an incident and counsel had then offered to "refresh your memory" by giving data which indicated that counsel had information that Graffio had been guilty as suggested. It was error on the part of the court to admit evidence as to pleas of guilty. Counsel for the respondents seeks to justify questions concerning Graffio's pleas of guilty by saying that he was not inquiring about convictions, but about pleas, which were admissible as admissions against interest made by Graffio. The trouble with that position is this: None of the testimony here under discussion was admissible against Graffio in proof of the only negligence charged against him, which was negligence in the matter of the accident out of which this action arose. And since plaintiffs were proceeding against Fekete upon the theory that Graffio was not her employee, but that she had been primarily negligent in selecting him as her independent contractor Graffio's admissions against his interest were not admissible against Fekete. (4 Wigmore on Evidence, 3d ed., § 1076, p. 115.) It was error, therefore, to permit these questions. And if counsel asked them in the knowledge that he had no right to do so he was guilty of unfair conduct. But we cannot on this record here justify a reversal for the reasons contended for, in view of the constitutional requirement that we may not reverse unless there has been a miscarriage of justice. We are not able to say that is so in this case. In addition to what has been said there are these further considerations: In several instances the references to the pleas of guilty were volunteered by Graffio himself, and in considering evidence touching this examination of Graffio the jury were under the admonition of the court, given before the testimony was received and again before the cause was submitted, that they were not to consider any of these matters in determining whether or not Graffio had in the instant case been guilty of negligence. Undoubtedly these matters were argued to the

jury and while we cannot condone all that was done, neither can we say that after an examination of the entire cause, including the evidence, we are of the opinion that the errors complained of and the conduct of counsel have resulted in a miscarriage of justice.

The judgment rendered against Agnes Fekete is reversed. The judgment against Vincent Charles Graffio is affirmed.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied October 22, 1953. Appellant's (Graffio) and respondents' petitions for a hearing by the Supreme Court were denied November 24, 1953. Carter, J., was of the opinion that the petitions should be granted.