LORENZ SCHNEIDER CO.,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 289, 290, Dockets 74–1336, 74–1495.

United States Court of Appeals,
Second Circuit.

Argued Jan. 16, 1975.

Decided April 30, 1975.

**446**

Marvin Dicker, New York City (Howard L. Ganz, Howard Lichtenstein, Kalman I. Nulman, and Proskauer, Rose Goetz & Mendelsohn, New York City, of counsel), for petitioner.

Peter J. Carre, Washington, D. C., (Peter G. Nash, Gen. Counsel, N. L. R. B., John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Robert Sewell, Washington, D. C., of counsel), for respondent.

Before WATERMAN, FRIENDLY and GURFEIN, Circuit Judges.

FRIENDLY, Circuit Judge:

We are again required to review one of the National Labor Relations Board's (NLRB) case-by-case determinations whether the relationship between a business enterprise and other persons is that of employer and employee or falls within the exclusion of "any individual having the status of an independent contractor" which Congress added to § 2(3) of the National Labor Relations Act (NLRA) in the Taft-Hartley Act in reaction to NLRB v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). See NLRB v. United Insurance Co., 390 U.S. 254, 256, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968).[1]

The proceedings here followed a familiar pattern. The case began on April 26, 1972, with a petition for representation of all of the "driver-salesmen" of Lorenz Schneider Co., Inc. (Schneider) "working out of 2000 Plaza Avenue, New Hyde Park, New York, and at Riverhead, New York", by Independent Routemen's Association (IRA). After a hearing the Regional Director issued a decision and direction of election on October 3, 1972. The Board granted Schneider's request for review but in a brief opinion, 203 N.L.R.B. 217 (1973), approved the Regional Director's decision. In May, 1973, the IRA won the election and was certified as the distributors' exclusive bargaining representative but Schneider refused to recognize it. There followed an unfair labor practice proceeding under § 8(a)(5) and (1) in which the General Counsel was granted summary judgment. Schneider has petitioned to review the ensuing order, 209 N.L.R.B. No. 16 (Feb. 22, 1974, as amended Feb. 27, 1974), and the Board has cross-petitioned for enforcement.

Schneider is a "key dealer" for manufacturers of a large number of well-known snack foods which it is franchised

---

1. The legislative history of the Taft-Hartley Act reveals a clear desire on the part of Congress to restrain the tendency of courts, as evidenced in the *Hearst Publications* decision, to bow to the supposed expertness of the Board in its assessment whether a particular group should be considered employees for purposes of § 2(3) of the National Labor Relations Act, 49 Stat. 449, 450 (1935). See H.R.Rep. No. 245, 80th Cong., 1st Sess., 18 (1947), reprinted in 1 Leg.Hist. of the Labor Management Relations Act, 1947, p. 309 (1948). By its amendment to § 2(3) Congress indicated that the question "whether or not a person is an employee is always a question of law, since the term is not meant to embrace persons outside that category under the general principles of the law of agency." 93 Cong.Rec. 6441–42 (1947), reprinted in 2 Leg.Hist., *supra*, at p. 1537 (statement of Senator Taft summarizing principal differences between the conference agreement and bill which the Senate had passed.) See also H.R.Conf.Rep. No. 510, 80th Cong., 1st Sess., 32–33 (1947), reprinted in 1 Leg.Hist., *supra*, at pp. 536–37.

to sell in the five counties of New York City and in Nassau and Suffolk Counties. It maintains two warehouses, one in New Hyde Park and the other in Riverhead on Long Island. The customers, which are all retail outlets, fall into two general classes—chain stores and independents. The business of the persons here in question is the sale to these retail outlets of snack foods which they have purchased at one of Schneider's warehouses, either directly after such purchase or in some instances after storage in warehouses of their own.

Prior to 1967 these individuals were called route salesmen and were represented, along with the warehousemen, by Local 802, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America (Local 802); the terms and conditions of their employment were thus prescribed by a collective bargaining agreement. Under that agreement they were guaranteed a basic weekly wage and also received a percentage commission on sales, monthly bonus payments dependent upon their average weekly sales—but with a certain minimum bonus payment being guaranteed regardless of actual sales attained, paid sick days, holiday and vacation pay, and other fringe benefits characteristic of the employer-employee relationship. They were required to work a five day week, to wear Schneider uniforms, and to use Schneider trucks. They were forbidden to sell any items other than those designated by Schneider and were often accompanied on their rounds by a Schneider supervisor. Concededly they were employees within § 2(3).

During the 1967 collective bargaining negotiations with Local 802, Schneider proposed that it be given the right to sell its customer routes to the salesmen, who would then become independent contractor-distributors. This proposal was apparently one of the factors which led Local 802 to call a lengthy strike. Ultimately Local 802 agreed that

Schneider might offer the routes to the salesmen. Most of them bought routes and ceased to be represented by Local 802; a few remained as salesmen and, along with the warehousemen, continued to be so represented.

Thereafter Schneider set about negotiating the distributorship agreements with the route salesmen who had opted for that course. They were represented by counsel acting for all as well as, apparently in some instances, by their individual counsel.

The individual agreements between Schneider and the distributor [2] gave the latter the exclusive right to sell and deliver products to a designated group of retail accounts; he was free to develop other accounts within Schneider's large franchise area, without regard to territory, although he could not service new chain store accounts—these were either sold to distributors or given as a replacement to a distributor who had serviced a store in the chain which had closed—or any account which was currently serviced by another of Schneider's distributors or a related company. The purchase price of the route was calculated by a formula that was dependent upon the average weekly sales on the particular route which had been realized in the past year. These prices generally exceeded $20,000. The agreement set the terms of payment, including a substantial down payment—the smallest of which thus far provided apparently has been $4,500— plus an interest bearing note secured by a chattel mortgage. The agreement contained language expressly disclaiming the relationship of employer and employee and affirming that of independent contractor. Within the constraints detailed below, the distributor was free to sell products not supplied by Schneider.[3] The distributor could resell the route to third parties but only after approval of that party by Schneider and on the same terms and conditions as those on which it

2. Since 1967 six different, yet essentially identical, forms of distributorship agreements have been used.

3. See note 6 *infra*.

had been purchased.[4] In the event of the distributor's death, unless a member of the family could operate the route, the estate was required to sell it to a third party or assign it to Schneider, again on the same terms. Neither party could terminate the agreement except for cause as therein defined. So far as concerns defaults by the distributor, the principal items were failure to make the payments due on the promissory note; the handling of items, in addition to those purchased from Schneider, which were in direct competition with those so purchased or were unauthorized by chain or co-operative stores;[5] wilful neglect in failing properly to serve customers; any act deemed "dishonest" to a customer or to Schneider; and failure to turn over various funds and records. There was no requirement that the distributor work any specified number of days or hours. He was free to take time off and to indulge in vacation as he pleased, with the right to engage replacements or to hire Schneider employees for a fee if they were available, subject only to a provision that if he became incapacitated for more than 90 days and was unable to supply a replacement, Schneider had a right of repurchase on the same terms and conditions as the initial purchase. Finally, the agreement provided that the distributor would abide by Schneider's "Book of Procedures for Operating Distributor Routes", of which more hereafter.[6]

The trucks used by the distributors are provided by them. Some are distributor-owned, having been purchased either from dealers or from a Schneider subsidiary. The others are leased—some from the Schneider subsidiary and some from outside firms. A leased truck can only be operated on weekdays and only in the regular course of snack food sales in the distributor's designated territory. Most of the distributors garage their trucks at night at Schneider's premises but there is no requirement about this save that trucks leased from the Schneider subsidiary must be kept at a garage to which it consents. The trucks are painted with the name of Wise Potato Chips, the primary manufacturer of Schneider's goods. So far as the independent stores are concerned, the distributors make their own determination whether to insist on payment in cash, or to accept a check or extend credit; in either of the latter events they proceed at their own risk in the absence of specific authorization from Schneider. The distributors' profit is the difference between their buying prices from Schneider and their selling prices less the cost of doing business. They receive no bonuses or fringe benefits. No withholding is made for income or unemployment tax.

■ Just as there is no serious dispute with respect to the facts, there can be little concerning the proper legal standard. The Supreme Court said in NLRB v. United Insurance Co., *supra*, 390 U.S. at 256, 88 S.Ct. at 990, that under the 1947 amendment, "there is no doubt that we should apply the common-law agency test here in distinguishing an employee from an independent contractor." See Restatement of Agency (2d) § 220 (1958). In Herald Company v. NLRB, 444 F.2d 430, 432–33 (2 Cir.), cert. denied, 404 U.S. 990, 92 S.Ct. 532, 30 L.Ed.2d 541 (1971), we approved the Board's more specific formulation in News Syndicate Co., Inc., 164 N.L.R.B. 422, 423 (1967):

In determining the status of persons alleged to be independent contractors,

4. In his Decision and Direction of Election the Regional Director found that in practice "this provision has not been enforced . . . and that . . . distributors have been allowed to sell for whatever price they can get." On review, the Board adopted this finding.

5. See also note 6 *infra*.

6. In addition to the prohibition against sales of products which compete directly with those of

the manufacturers which Schneider represented, ¶ 1. of the Book of Procedures provided that products of other manufacturers might be sold only with Schneider's permission; however, it further provided that consent would not be withheld "unreasonably." Certain distributors in fact sell the products of other manufacturers—such as fresh vegetables—and we have been cited no evidence that consent to sell any product has ever been withheld.

the Board has consistently held that the Act required application of the 'right of control' test. Where the one for whom the services are performed retains the right to control the manner and means by which the result is to be accomplished, the relationship is one of employment; while, on the other hand, where control is reserved only as to the result sought, the result is that of an independent contractor. The resolution of this question depends on the facts of each case, and no one factor is determinative.

■ Schneider's principal contention, and it is a powerful one, is that the Board did not give adequate weight to the events of 1967. Certainly Schneider and its former "route salesmen" thought they were altering their relationship,[7] a change which the "route salesmen" believed to be worth many thousands of dollars and led them to drop their bargaining representative and to go without one for five years. While counsel for the Board are right in saying that "the parties' intent is not controlling on the question of 'employee' vs. 'independent contractor' status", this is not the same as saying it is irrelevant; to the contrary intent is pertinent "insofar as such belief indicates an assumption of control by the one and submission to control by the other" or the opposite. Restatement of Agency (2d), *supra*, § 220 comment m at p. 492. Clearly the parties in 1967 intended to make a drastic change; the dispute is whether what they did was sufficient to give meaning to what they said.

The Board relied mainly on two factors in concluding that the employer-employee relationship continued, and in distinguishing its contrary decision in Gold Medal Baking Co., Inc., 199 N.L.R.B. 895 (1972), which Schneider urges to be a *fortiori* case support for a holding of independent contractorship.[8] One was what the Board considered to be restriction in pricing imposed by Schneider; the other was supposedly greater supervision over procedures.

Schneider's distributors admittedly have practically no freedom of pricing with respect to chain stores since the prices at which the latter buy the snack foods are fixed in direct dealings between the chain's buyer and the manufacturers. Schneider makes a partial answer to this by pointing out that this control over the prices chargeable to

---

7. Consistent with this view is the fact that a few months after the sale of certain of the routes, Local 802 conducted another strike which was joined by those route salesmen who had declined to purchase their routes, but was not joined by the route salesmen who had changed their relationship to that of distributors.

8. Schneider argues that every factor listed in the penultimate paragraph of the Board's *Gold Medal* opinion is present here and that the following facts, *inter alia*, in *Gold Medal* were less favorable to a conclusion of independent contractor status for the distributors:

(1) The company's right to assign additional customers;

(2) A clause in the distributorship agreement obligating the distributor to pay liquidated damages if he purchased products from anyone else without the company's written consent;

(3) A ban on the exchange of customers without the company's prior approval and of payment on such exchange even when approved;

(4) All the distributors but one had the company's name painted on their trucks; and

(5) The distributors were not required to purchase the routes which they were entitled to service; instead they were granted these without any investment of their own funds.

In an excess of technicality, counsel for the Board object to our looking at the agreement in *Gold Medal*, which Schneider's counsel printed as an appendix to their reply brief, on the ground that the agreement is not in the instant record. But it was in the record in *Gold Medal* and our examining it to further our understanding of that decision is no more than what we regularly do in endeavoring to arrive at the true meaning of decisions of the Supreme Court, of other courts or even of our own. On the other hand, Board counsel are quite right in protesting the inclusion by Schneider's counsel of two letters from distributors criticizing IRA's attorneys for having taken the position that they were employees. We have not considered these letters.

chain stores is exercised by others, not by itself, and that the distributor still has an opportunity to maximize profit by greater efficiency. There seems to be equally little doubt that the distributors enjoy considerable freedom in pricing with respect to the independents, which, according to testimony by Kenneth Price, Schneider's vice president and general manager, comprise approximately sixty per cent of the total accounts. Normally the distributor can and does charge whatever the traffic will bear and may grant or withhold rebates traditional in the industry. Despite the fact that these price variations may amount to only a few cents, given the relatively small wholesale price of these products such price differences are not insubstantial. The Board counters that this freedom is restricted by Schneider's frequent advertising of discounts from suggested resale prices; although the distributors are not required to observe these discounts, they have no practical alternative.[9] Citing substantial evidence in the record, Schneider argues that any such advertising of discounts does not affect the distributors' actual price levels since the advertisements convey only the amount of reduction and contain no information with respect to the regular price upon which the reductions operate. In any case, here again, even if the distributors' pricing freedom may not be so great as might be thought at first blush, they have an opportunity to maximize profits by greater efficiency, better salesmanship, or added accounts, although to be sure, some of these opportunities would also be available to a salesman-employee operating on a commission basis.[10]

While the Board approved the Regional Director's finding "that there is no day-to-day supervision" of the distributors, it considered that the enforcement of the agreed book of procedures and the activities of Schneider's distributor representatives showed retention of a right of control. Emphasis was placed on one instance where a distributor refused to install additional shelving desired by a store which the distributor originally had paid $2,500 to service and Schneider allegedly installed the racks; the record with respect to this incident is so confused as to who said what and who did what as to afford little basis for concluding anything except that tempers had become aroused and that the store manager's ringing declamation, "[t]his store must have Wise Potato Chips in the store", had a catalytic effect. The Board also relied on a provision in the book of procedures set forth in the margin[11] and an incident where Schneider broke the padlocks on the trucks of two distributors, filled them with merchandise and made deliveries to their retail outlets; however, the opinion writer omitted the important facts that the two distributors had already given notice of termination and that Schneider had made repeated unsuccessful efforts to reach them. The distributor representatives, each of whom generally oversees ten routes, visit the stores to check on

9. In his decision the Regional Director also referred to memoranda sent by Schneider to the distributors warning them that the same prices should be charged all customers "lest the Employer and/or the distributors be charged with violations of uniform pricing regulations." These memoranda reflect concern, expressed both in the distributorship agreements and the Book of Procedures, that distributors' pricing policies should conform to the dictates of the Robinson-Patman Act, 15 U.S.C. §§ 13, 13a, 13b, 21a.

10. Another means by which certain distributors have increased their potential earnings is the practice of over-stocking products when special promotions are conducted by the manufacturers. After obtaining these goods at significantly lower than normal prices from Schneider, they then hold them—assuming the business risk inherent in such a procedure—for resale in the future, thereby possibly increasing their overall profits.

11. In order that the continued good will of all customers be sustained, it is necessary that proper attention be given to servicing accounts. This insures the continued expansion of your sales. Stores must be served at least once each week, and for larger independent stores and chains, as many more times each week as is necessary to keep the stands, racks and gondolas adequately supplied with fresh merchandise.

the distributors' performance and then meet about once in three weeks with those distributors who wish to attend. They also report non-compliance by the distributors to Schneider's general sales manager, but there is no evidence that such reports have led to terminations. The representatives have no right to accompany, and generally do not accompany, the distributors on their routes, although occasionally they have ridden with distributors—with their permission—in order to observe their methods of operation and as a basis for making suggestions to improve their overall performance, and the Regional Director cited one instance when a representative followed a distributor, after being refused permission to accompany him on his route, apparently without consequence.

We do not find these facts to be so significant as did the Board. Every business which operates through a system of franchises, whether they are food snack routes or Howard Johnson restaurants, must retain some right to oversee the franchisees' operations, for a variety of reasons—to safeguard its own good name and the welfare of customers who rely on it and to protect its interest in the business' overall profits, which might be significantly reduced due to the effect on its reputation of even a few substandard operations, and in the individual profits from sales to each distributor, as well as in any unpaid balance of the purchase price of the routes.[12] In many

cases the Board has stated the question as being whether the control reserved concerns "the manner and means by which the result is to be accomplished" or "only as to the result sought." See, in addition to the extract from News Syndicate Co., Inc., 164 N.L.R.B. 422, 423–24 (1967), quoted above, The H. E. Koontz Creamery, Inc., 102 N.L.R.B. 1619, 1623 (1953); Albert Lea Cooperative Creamery Ass'n, 119 N.L.R.B. 817, 821 (1957); Golden Age Dayton Corp., 124 N.L.R.B. 916, 918 (1959); and Pure Seal Dairy Co., 135 N.L.R.B. 76, 79 (1962). Yet the test as thus stated is almost impossible to apply, since the "result" is a function of the "manner and means". The operator of a Howard Johnson restaurant would scarcely become an employee because the franchisor retained a specific right to terminate on account of rats being in the kitchen rather than for uncleanliness generally. All that can be meaningfully said is that the more detailed the supervision and the stricter the enforcement standards, the greater the likelihood of an employer-employee relationship, and conversely. We do not think Schneider's supervision of the distributors, particularly when this is contrasted with the pre-1967 relationship, points very high on the employer-employee scale.

When we turn to the case law the Board naturally places heavy reliance on our *Herald Company* decision, *supra*, 444 F.2d 430. However, the compound of facts in that case contained many elements, set forth in the margin,[13] pointing

---

**12.** The Regional Director was able to cite only one instance when a distributor had his route "taken away from him" by Schneider—indicating only that he had "lost his route as the result of dishonesty." Schneider contends, citing substantial evidence in the record, that the actual facts of the situation were the following: the distributor involved was accused of stealing merchandise by one of his customers who then refused to deal with him; the distributor then "elected" to sell his route, instead of pursuing the alternative of hiring someone to operate it. Regardless of whether the termination of this distributor is characterized as involuntary, this act alone does not advance very far the proposition that Schneider and the distributors share an employer-em-

ployee relationship. Franchisors clearly have an interest in protecting their reputation in the industry and should be able to terminate dishonest franchisees without having to don the garb of employer.

**13.** The newspaper distributors were required to submit to the company the names and addresses of carrier boys which they employed; the company often gave instructions directly to the boys and in a few instances had directed the distributor to change or discharge them; in cases of non-delivery the company could deliver papers and charge the distributor; the company "inundate[d] the distributor with instruction letters, memoranda, telephone calls, and requests for office meetings"; the

to an employer-employee relation which are not present here. If we look at cases elsewhere, in addition to the Board's *Gold Medal* decision, *supra*, so belabored by Schneider's counsel, Frito-Lay, Inc. v. NLRB, 385 F.2d 180 (7 Cir. 1967); Meyer Dairy, Inc. v. NLRB, 429 F.2d 697 (10 Cir. 1970); Carnation Co. v. NLRB, 429 F.2d 1130, 1134 (9 Cir. 1970); and Brown v. NLRB, 462 F.2d 699 (9 Cir.), cert. denied sub nom. San Francisco Newspaper Printing Co., Inc. v. NLRB, 409 U.S. 1008, 93 S.Ct. 441, 34 L.Ed.2d 301 (1972), are favorable to Schneider, although, of course, none is identical. Schneider relies also on a ruling wherein the Internal Revenue Service, using the same "right to control" standard and aware of the Board's decision in this case, ruled that these very distributors were not subject to federal employment tax and income tax withholding. IRS Ruling of Sept. 25, 1973, as amended Nov. 1, 1973. The recent decision in NLRB v. Deaton, Inc., 502 F.2d 1221 (5 Cir. 1974), and other decisions cited by the Board are substantially further removed than the cases supporting Schneider's position.

We thus have no doubt that if this case were before us on review of a district court, e. g., after a bench trial of an action against Schneider for personal injuries caused by a distributor's truck, we would reverse a holding that Schneider was liable as an employer.[14] *Compare* Bohanon v. James McClatchy Publishing Co., 16 Cal.App.2d 188, 60 P.2d 510 (D.C. 4th D.1936). That, however, is not necessarily enough to justify a denial of enforcement. *See* 93 Cong.

Rec. 3839 (1947) (remarks of Sen. Taft); Jaffe, Judicial Control of Administrative Action, 615–16 (1965); Stern, Review of Findings of Administrators, Judges and Juries: A Comparative Analysis, 58 Harv.L.Rev. 70, 88–89 (1944). But see Vanderbilt, Introduction, 30 N.Y.U.L. Rev. 1267, 1268 (1955). *Compare* NLRB v. Southland Mfg. Co., 201 F.2d 244 (4 Cir. 1952) with *id.* at 248 (concurring opinion). See also Gellhorn & Byse, Administrative Law, Cases and Comments, 359–60 (5th ed. 1970). In *United Insurance, supra,* 390 U.S. at 260, 88 S.Ct. at 991, the Court, although recognizing that a conclusion of employee status is "not a purely factual finding" but rather "the application of law to facts," and also that "such a determination of pure agency law involved no special administrative expertise that a court does not possess," invoked Mr. Justice Frankfurter's statement in Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951) "that even as to matters not requiring expertise" a court may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" We cannot say that here the Board had no basis for its conclusion. But *Universal Camera,* as implemented in this area by *United Insurance,* could not have meant to extend immunity from judicial review that far; to do so would run counter to the whole thrust of that important opinion as to the new "mood" concerning judicial review, 340 U.S. 487, 71 S.Ct. 456, which Congress carried into the Taft-Hartley Act and the APA. The respect required

---

company "runs numerous promotional contests in which the distributors' participation is encouraged to the point where it is compelled"; the company limited a distributor's earnings through "wholesale price ceilings" which in effect raised the price of papers to them when their purchases exceeded a certain amount; bonuses and other extracontractual payments "are an important part of the distributors' income"; franchises were for short terms, 444 F.2d at 434; see also *id.* at 435 n.1.

14. This circuit would not consider such a decision to be "a finding of fact" within the protection of Fed.R.Civ.P. 52(a). See Mamiye Bros. v. Barber S. S. Lines, Inc, 360 F.2d 774, 776–78 (2 Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966); Esso Standard Oil S.A. v. S.S. Gasbras Sul, 387 F.2d 573 (2 Cir. 1967), cert. denied, 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968); Cleary v. United States Lines Co., 411 F.2d 1009, 1010 (2 Cir. 1969) (*per curiam*). *See also* In re Hygrade Envelope Corp., 366 F.2d 584, 587–89 (2 Cir. 1966).

to be accorded the Board's application of "pure agency law" surely cannot exceed what is demanded when it acts *within* the area of its expertise, where "a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view", 340 U.S. 488, 171 S.Ct. 465. A reviewing court must bow to the Board's view in an area outside its expertise only when this is *"fairly* conflicting" (emphasis supplied).

█ At first blush this seems a hard test to apply. But we can get hold of it here by changing our hypothetical to review of a judge's ruling permitting an action against Schneider for personal injuries caused by a distributor's truck to go to a jury.[15] If we would reverse such a ruling, that could only be on the ground that there was no fair basis on which a jury could find liability. We are quite sure we would. Compare Hilyar v. Union Ice Co., 45 Cal.2d 30, 286 P.2d 21 (1955); Batt v. San Diego Publishing Co., 21 Cal.App.2d 429, 69 P.2d 216 (D.C. 4th D.1937); Skelton v. Fekete, 120 Cal. App.2d 401, 261 P.2d 339 (D.C. 3d D.1953); Skidmore v. Haggard, 341 Mo. 837, 110 S.W.2d 726 (S.Ct. Div. 1 1937).

The petition for review is granted and the cross-petition for enforcement is denied.

---

**15.** We think these hypotheticals and state court tort cases are especially useful since we have the impression that the natural tendency of the Board and of reviewing courts to look primarily to other NLRB cases involves some degree of moving away from the "pure agency law" test mandated by Congress in the Taft-Hartley Act and inching back toward the view expressed in the *Hearst* opinion, 322 U.S. at 124, 64 S.Ct. at 857, that "Congress had in mind a wider field than the narrow technical legal relation of 'master and servant' . . ."