[Civ. No. 2141.   Fourth Appellate District.—February 18, 1938.]

MOUNTAIN MEADOW CREAMERIES (a Corporation) et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION OF THE STATE OF CALIFORNIA, and EDNA R. DODGE, Respondents.

F. Britton McConnell for Petitioners.

Stickney & Stickney, as *Amici Curiae*, on Behalf of Petitioners.

Everett A. Corten and Harry P. Sweet for Respondents.

MARKS, J.—This is an original proceeding in this court to annul an award of the Industrial Accident Commission which gave to Edna R. Dodge, widow of George P. Dodge, compensation in the sum of $5,150 for the death of her husband.

The sole question presented is whether George P. Dodge, now deceased, was an employee of or an independent contractor with Mountain Meadow Creameries, a corporation. The solution of this question depends upon the construction to be placed on a contract between deceased and the corporation.

The Industrial Accident Commission held that the relationship created was that of employer and employee. Respondents seek to uphold this conclusion because of the provisions of the contract which they maintain gave the corporation the right of discharge of, and the right of control over deceased. A proper solution of the problem requires a review of the more important provisions of the contract. As that instrument covers about twenty-eight printed pages of the record it is obvious that we must content ourselves with a summary of its pertinent provisions.

The contract was dated December 12, 1936. It was executed by Mountain Meadow Creameries, called Producer, and George P. Dodge, called Distributor. It recited that the Producer was engaged in the production of dairy and poultry products and had built up a valuable business in San Diego wherein is the territory described in the contract. The Producer granted to the Distributor the sole and exclusive right to sell and dispose of its products in that territory, but reserved and retained "to itself the good will of all the present and future trade in said territory, and names,

addresses and requirements of all present and future purchasers therein''. During the life of the contract (one year and thereafter from year to year unless terminated) the Producer agreed not to retail any of its products within the territory, but reserved the right to wholesale its products therein. It agreed to turn over to the Distributor all orders received by it for retail sales within the territory.

The Distributor agreed not to solicit, sell or deliver any products outside of the district nor to handle any competing products. Violation of this clause was ground for immediate cancellation of the contract and the assessment of a penalty on the Distributor.

The Distributor was required to furnish to the Producer lists of customers and on termination of the contract an adjustment of the value of the route was to be made on the basis of one dollar credit to the Distributor for each new customer which he had secured and a like debit for each customer furnished by the Producer at the date of the contract.

The Producer was given the right to change the boundaries of the delivery district, with compensation to be paid to the Distributor if a reduction of the number of customers should be caused by the change in boundaries. In case the Distributor suffered a ten per cent shrinkage in business the Producer had the right to reduce the size of the territory served by the Distributor, or to terminate the contract on two days' notice.

Provision was made for the purchase by the Distributor from the Producer of the products to be delivered to customers. An elaborate plan was set forth for determining the prices the Distributor was to pay for the products he purchased. He was required to pay cash on delivery for products. The giving of two insufficient funds checks for bills would furnish grounds for cancellation of the contract.

It was estimated that two hundred fifty customers were turned over to the Distributor at the date of the contract. It was provided that if the number of unit sales should decrease below that average figure over a thirty-day period, the Producer might terminate the contract.

The Producer was permitted to fix or change the location of the depot at which the Distributor could obtain his products. A scheme was worked out to compensate for special deliveries and for return of unsold products by the Dis-

tributor. Route books were to remain open for inspection by the Producer. The Producer required the Distributor to make reports of the condition of the route. Contents of the route books were to be considered confidential.

The Distributor was required to purchase and maintain an automobile delivery truck of make and body design approved by the Producer. It was to be kept in good repair by the Distributor and was to be painted once a year with appropriate lettering on it. He might purchase the truck from the Producer. In the event he did so, he was required to execute a chattel mortgage for the unpaid purchase price, if any, which should also be security for performance of the contract.

The Distributor and his employees were required to keep neat and clean and to wear clean white uniforms while on duty. They were required to be courteous and efficient in the performance of their duties. The Distributor could either perform under the contract himself or through employees who were not to be employees of the Producer. The Distributor was required to carry public liability insurance and insurance on his employees under the Workmen's Compensation Act.

The contract also contained the following provisions:

"While it is not the intention of either party hereto to terminate this agreement before its expiration, it is the desire of both parties that either of them shall have the privilege of terminating the same; therefore, this contract may be terminated by Producer by giving to Distributor a two weeks' written notice thereof; and except as herein provided, (no termination during the first 120 days) Distributor may terminate this agreement at any time by giving Producer four weeks written notice hereof. . . .

"It is understood that the business developed by Distributor in the territory covered by this contract may be handled and served by him only, so long as this contract shall remain in force and effect. At no time shall Distributor have any right to sell, assign, transfer or dispose of such business to any other person. . . .

"It is further understood and agreed that this contract shall in nowise be construed to create any co-partnership between the parties hereto nor the relationship of principal and agent . . ."

An elaborate scheme for mutual compensation was worked out in case of a forfeiture or termination of the contract within the first year.

When we take the contract by its four corners and construe it as a whole, the conclusion is inescapable that the Mountain Meadow Creameries placed a milk route in the possession of Dodge; that Dodge was required to purchase his supplies from the corporation and deliver them to the consumers within the district allotted to him. The corporation occupied the position of a wholesaler who furnished Dodge, a retailer, with an initial list of customers and sold him merchandise at wholesale prices. Dodge, the retailer, delivered these supplies to the customers and collected the retail prices from them.

Respondents urge that the contract gave the Producer the right to terminate it for various reasons, which are specified, and the absolute right to terminate it upon two weeks' written notice which, it is argued, was equal to the right of discharge of an employee by an employer.

It must be conceded that the right of immediate discharge is an incident of the relationship of employer and employee and points strongly to the existence of such a relationship. (*Press Pub. Co.* v. *Industrial Acc. Com.*, 190 Cal. 114 [210 Pac. 820].) However, we do not construe these provisions of the contract as equivalent to the right of discharge possessed by an employer. Except in the case of the termination of the contract by the Producer on two weeks' notice, the right of termination existed only after some breach of the provisions of the contract by the Distributor. It is clear that the right of termination under these clauses was for cause and was intended to secure satisfactory performance by the Distributor. This looked to the results to be obtained, namely, good service. In an independent contract the parties may incorporate provisions tending to secure satisfactory results. Such provisions neither negative the relationship of independent contract nor point to the relationship of employer and employee.

It is true that the contract provided for its termination by either party on notice. If we assume that it could be so terminated without cause, still these provisions negative the idea that they are equivalent to the right of discharge possessed by an employer. In case this right of termination

was exercised by either party, an elaborate plan for compensation by one to the other was set forth. This would indicate the recognition of a property right in the milk route by each one of the parties; on the part of the Producer in the list of customers it had at the time of the execution of the contract; and on the part of the Distributor in those customers obtained by him. This is inconsistent with the relationship of employer and employee. This right of termination is not equivalent to the right of an employer to discharge an employee, or the right of an employee to quit his employment.

Respondents further urge that the contract gave to the Producer such control over the Distributor that the finding of the existence of the relationship of employer and employee must be sustained. We find nothing in the contract giving to the Producer such complete or unqualified control over the Distributor as to indicate the relation of employer and employee. On the other hand, the limited control given to the Distributor indicates a desire to obtain satisfactory results under the contract instead of an intention to give to the Producer that detailed right of control over the actions of the Distributor which is an incident of the relationship of employer and employee. One who contracts with another is permitted to retain certain measures of control which would look to the results to be obtained without assuming the responsibilities that follow the relation of employer and employee. In *Moody* v. *Industrial Acc. Com.*, 204 Cal. 668 [269 Pac. 542, 60 A. L. R. 299], it is said:

"Section 8 (b) of the Compensation Act, above referred to, provides that 'Any person rendering service for another, other than as an independent contractor, or as expressly excluded herein, is presumed to be an employee within the meaning of this act'. Many definitions of an 'independent contractor' have been made, but they are not essentially different. (*Franklin Coal Co.* v. *Industrial Com.*, 296 Ill. 329, 334 [129 N. E. 811].) The following definition may be regarded as a correct statement of what constitutes an independent contractor: One who renders service in the course of an independent employment or occupation, following his employer's desires only in the results of the work, and not the means whereby it is to be accomplished. (*Brown* v. *Industrial Acc. Com.*, 174 Cal. 457, 460 [163 Pac. 664]; *Green*

v. *Soule,* 145 Cal. 96, 99 [78 Pac. 337]; *Barton* v. *Stude-
baker Corp.,* 45 Cal. App. 707 [189 Pac. 1025]; *North Bend
Lumber Co.* v. *Chicago etc. R. R. Co.,* 76 Wash. 232, 242 [135
Pac. 1017].) 'It is well settled that where one person is
performing work in which another is beneficially interested,
the latter may exercise over the former a certain measure of
control for a definite and restricted purpose without in-
curring the responsibilities, or acquiring the immunities, of
a master, with respect to the person controlled.' (*Western
Indemnity Co.* v. *Pillsbury,* 172 Cal. 807, 811 [159 Pac. 721].)
The decisive test of the relationship is: Who has the right
to direct what shall be done, and when and how it shall be
done? Who has the right to general control? (*Lassen* v.
*Stamford Transit Co.,* 102 Conn. 76 [128 Atl. 117, 118];
see, also, *Fidelity & Casualty Co.* v. *Industrial Acc. Com.,*
191 Cal. 404, 407 [43 A. L. R. 1304, 216 Pac. 578].) In
other words, the test of what constitutes independent service
lies in the control exercised. The test of control means com-
plete control, and we must carefully distinguish between
authoritative control and mere suggestion as to detail. (*West-
ern Indemnity Co.* v. *Pillsbury, supra.*)''

We need cite only a few of. the instances in which the
Distributor had complete freedom of choice in the performance
of the contract in order to demonstrate his freedom from
that complete, unqualified or authoritative control necessary
to constitute him an employee. Within the limits of satis-
factory service, he could choose his own time for deliveries
and the route to be followed in making deliveries. He could
deliver in person or ·hire others to deliver for him. He
could operate one or more trucks. He was required to
furnish one truck and pay its operating and maintenance
expense. The amount of his compensation depended on his
industry in keeping old customers and securing new ones.
He was required to buy all products from the Producer and
to pay cash on delivery for them. The bills owed by cus-
tomers were his and he took the risk of making collections.
Any losses from bad bills were his. The Distributor, not
the Producer, sold the products to the customers. There
was no limitation on the credit to be extended to the cus-
tomers. These are but some of the provisions of the con-
tract that are entirely inconsistent with the relationship
of employer and employee and which entirely negative the

existence of that complete, unqualified or authoritative control necessary to establish that relationship.

In legal effect the contract here involved cannot be distinguished from those before the courts in the cases of *Bohanon* v. *James McClatchy Pub. Co.*, 16 Cal. App. (2d) 188 [60 Pac. (2d) 510], *Rathbun* v. *Payne*, 21 Cal. App. (2d) 49 [68 Pac. (2d) 291], and *Batt* v. *San Diego Sun Pub. Co.*, 21 Cal. App. (2d) 429 [69 Pac. (2d) 216]. In each of these cases it was held that the contracts created the relationship of independent contractor and not of employer and employee, or master and servant.

Every contention made by respondents here was made in the three cases just cited. They were considered at length, answered, and resolved against respondents. To consider these contentions again in detail could serve no useful purpose. Under the provisions of the contract, measured by the authorities we have cited, the conclusion is inevitable that Dodge was neither the servant nor the employee of the Mountain Meadow Creameries, but an independent contractor. It follows that the Industrial Accident Commission had no jurisdiction to make the award in question here.

The award is annulled.

Barnard, P. J., concurred.