[S. F. No. 18975. In Bank. July 20, 1954.]

DOLORES DUNN, as Special Administratrix, etc., Appellant, v. PACIFIC GAS AND ELECTRIC COMPANY (a Corporation), Respondent.

266

268

William B. Mead and Cyril Viadro for Appellant.

Robert H. Gerdes, Carlson, Collins, Gordon & Bold, John Ormasa and Robert Collins for Respondent.

SCHAUER, J.—In this wrongful death action, plaintiff administratrix appeals from an order and judgment of non-suit. The decedent met his death by electrocution when the elevated bed of a dump truck came into contact with one of defendant's high tension wires. For the reasons hereinafter elucidated we have concluded that the issues involved should have gone to the jury, and, hence, that the judgment should be reversed.

Preliminarily, it is noted that plaintiff has filed two separate notices of appeal, one from the written "Judgment of Non-Suit" entered November 28, 1951, and the other from an order granting "motions for a judgment of non-suit" which was not entered in the court's permanent minutes until April 15, 1952. Since such order was not entered until subsequent to the entry of the written judgment the order is wholly ineffective and the purported appeal therefrom will be dismissed.

With respect to the merits of the appeal, it is to be recalled that a nonsuit may be granted only when, disregarding conflicting evidence, giving to plaintiff's evidence all the value to which it is legally entitled and indulging in every legitimate inference which may be drawn from that evidence favorable to plaintiff's case, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff. (*Raber* v. *Tumin* (1951), 36 Cal.2d 654, 656 [226 P.2d 574]; see also *Sokolow* v. *City of Hope* (1953), 41 Cal.2d 668, 670 [262 P.2d 841].)

From the evidence, viewed in the light most favorable to plaintiff, it appears that the decedent, Austin Dunn, was employed as a bulldozer operator by the East Bay Regional Park District. During the work week beginning Monday, June 20, 1949, the district commenced to fill and level a portion of its Tilden Park property in Contra Costa County as a preliminary in construction of a golf driving range and parking area. The fill material, consisting of dirt and rocks, was hauled to the area by employes and trucks of defendant Freethy,[1] a contractor who was doing other construction work nearby and who needed a place to dump such materials. Since, as stated by plaintiff, the district "apparently needed what he had to dump, it had previously authorized him to do so." Dunn's job was to spread the dirt and rocks with a bulldozer. The district's golf course superintendent, Collins, was in charge of the construction, but when he was busy elsewhere Dunn would tell the truck drivers where to dump.

Defendant, pursuant to an easement granted to it by the park district, owned and maintained three uninsulated high tension (12,500 volts of electricity) wires, which extended in a north-south direction over a portion of the contemplated improvement. By Wednesday morning, June 22, the filling, leveling and grading of the area underneath the wires had been completed, with a resultant raising of the ground level and reducing of the clearance at that point by approximately 6 feet, leaving the distance between the wires and the ground at 12 feet 6 inches. Collins instructed the truck drivers not to dump anything more in that particular area and told Dunn not to push anything there. Thereafter "all the work was being done to the west or to the east of the wires." Up to this time defendant had neither notice nor knowledge that the clearance of its wires had been impaired. On Thursday morning, June 23, a crew of defendant's workmen went to the area to install a transformer. The foreman of the crew saw loaded trucks proceeding under the high voltage wires and that the reduced clearance caused by the fill created a dangerous situation. He spoke with Collins concerning the danger of the impaired clearance and the high voltage, and Collins immediately started stopping the truck drivers and telling them that the wires were hot and to stay out from under them. Hickman was one of the truck drivers he warned.

---

[1] Freethy is not a party to this appeal, and the record does not disclose what, if any, disposition was had of the action as against him.

Plaintiff's decedent, Dunn, was present and Collins warned him at the same time, as well as "several" other times, "every time I was around him" both on Thursday and Friday. Both Hickman and Dunn stated that they would avoid the wires. Upon inquiry from Collins, defendant's foreman stated his company would have to put in a higher pole.

That afternoon (Thursday) Rucker, a supervisor of defendant's pole and transmission line department, who had received a report of the dangerous condition, went to the area. He saw trucks passing under the wires. He spoke with Dunn, and "cautioned him about the proximity of the wires and warned him that they were twelve thousand volts and that there should be no more dumping there," and that neither trucks nor Dunn's bulldozer should go under the wires. Dunn said he had already been warned by another of defendant's men "previously that day." Rucker then located Tom Flood, chief aide to the district manager of the park district, who "seemed to be very pleased that I had showed up, because he said that morning he had noticed the fill was getting close to the line and intended to call us, but he hadn't done so." Rucker and Flood looked the area over together and Rucker told Flood "there shouldn't be any more dumping within ten feet of the line, and he agreed that that would be the case, and called Mr. Dunn [decedent] over, and in my presence instructed him not to permit any more dumping within ten feet of the line. At that time I again cautioned Mr. Dunn as to the voltage of the line . . ." Dunn and Flood both stated "no more dumping would be permitted in the area where there was impaired clearance . . . and no closer than ten feet on either side of these wires." Rucker also told Flood "I would have an estimator out to see him the next morning about installing a pole at the edge of the fill." Flood testified that he had realized, prior to the discussion with Rucker, that the wires were low, of high voltage, and a danger to life, and had "cautioned the trucks to stay out from under it. . . . Mr. Dunn and I had discussed it, because we knew that the pole had to be put in there before the job was complete . . . [W]e discussed the fact that we wouldn't —shouldn't put any more fill in there; the wire was too low." On Wednesday Flood had told Dunn not to operate tractors under the wires and not to permit the trucks to go under them. Flood had intended to notify defendant of the dangerous condition but had not done so. He testified that he told Rucker that no trucks would go under the wires. Rucker

returned to his office, reported the condition to his supervisor, and asked him to arrange to have an estimator meet Flood on Friday morning. Friday morning Collins again told both Dunn and the truck drivers to stay out from under the wires and not to dump or push anything in there.

About one o'clock Friday afternoon Adams, an employe of the district, drove Dunn in a trash truck from the park clubhouse toward the parking area. Dunn got off the truck on the road leading into that area, and when last seen by Adams, Dunn was some 700 to 800 feet from the wires and walking in their general direction. As Adams continued on to the driving range shack he saw a dump truck coming into the area. Adams went into the shack and talked a couple of minutes with the carpenter. The two men then walked outside and saw both Dunn and Hickman lying on the ground near the dump truck, which was under the high tension wires. The bed of the truck was elevated and touched one of the wires. Dunn moved his arms, hitting a wheel of the truck, and "there was a big flash." Hickman, who was lying face down under and parallel to the truck's fender, was also moving, and there was a flash every time his back and shoulders touched the running board. As Hickman moved he touched Dunn, and both men were electrocuted. The same afternoon, "shortly after" the accident, defendant's crew arrived and commenced installation of a pole to raise the wires. There were no other eyewitnesses to the occurrence.

In support of the nonsuit, defendant urges, first, that the evidence shows as a matter of law that it breached no duty of care owing to the decedent, Dunn, and therefore was guilty of no negligence toward him. It also contends that as a matter of law the evidence establishes both contributory negligence by Dunn, and that the sole proximate cause of Dunn's death was the intervening act of Hickman in raising the truck bed so that it touched one of the wires.

Plaintiff, contending that the case should have gone to the jury on each of these points, argues that under rules set forth in General Order 95 of the Public Utilities Commission defendant was required to maintain the wires at a minimum clearance of 22 feet, that such rules established a standard of care which defendant had violated by maintaining a clearance of only 18 feet 6 inches even before the filling work here involved, and that plaintiff was entitled to have a jury determine whether such violation constituted negligence towards the decedent, Dunn. Rule 37 of General Order 95 establishes

a basic minimum clearance of 25 feet above the ground along thoroughfares in rural districts or across other areas capable of being traversed by vehicles or agricultural equipment. Subparagraph (a) of rule 54.4-A(2) permits reduction of the clearance to 22 feet in rural districts, "for conductors crossing or overhanging traversable portions of public or private roads or driveways." Subparagraph (b) of the same rule states that in rural districts the clearance may be reduced to 18 feet "for lines across areas capable of being traversed by agricultural equipment and along roads where no part of the line overhangs any traversable portion of a public or private roadway."

In 1948 the district had granted defendant the easement for the lines here involved. Both prior to such grant, and also at the time of the accident, a road existed which crossed under the lines at a point where they were less than 22 feet above ground before the filling operations. The accident to Dunn occurred "near" the road, but the evidence does not show that it occurred on the road area nor how near to it. It thus appears that subparagraph (b) of rule 54.4-A(2) applies, since the area was in a rural district and capable of being traversed by agricultural equipment. Subparagraph (a) of that rule, requiring a 22-foot clearance, when read in the light of subparagraph (b), clearly applies only to lines crossing or overhanging traversable portions of public or private roads and does not mean that if the lines cross a roadway in a rural district the 22-foot clearance must be maintained for the entire district. Prior to the filling done by the district, the lines were some 6 inches above the 18-foot height required by subparagraph (b). In any event it was not the height at which defendant had maintained its wires before the fill but, rather, the greatly reduced clearance which existed after the fill, which contributed to the tragedy.

With respect to the impaired clearance existing after the filling operations, plaintiff states in her brief that she does not seek to hold defendant "liable for having created the dangerous condition. It makes no difference who created it. The important point is that, after the level of the parking area was raised, a dangerous condition existed. We seek to hold defendant liable for having allowed it to remain for an unreasonable length of time." The time charged as being unreasonable is approximately 27 hours.

In *Polk* v. *City of Los Angeles* (1945), 26 Cal.2d 519,

525 [159 P.2d 931], this court stated that ''On the subject of negligence the standard of care is, that one maintaining wires carrying electricity is required to exercise the care that a person of ordinary prudence would exercise under the circumstances. Among the circumstances are the well known dangerous character of electricity and the inherent risk of injury to persons or property if it escapes. Hence, the care used must be commensurate with and proportionate to that danger. [Citations.] ■ Specific application of that standard requires that wires carrying electricity must be carefully and properly insulated by those maintaining them at all places where there is a reasonable probability of injury to persons or property therefrom. [Citations.] ■ Upon those controlling such instrumentality and force is imposed the duty of reasonable and prompt inspection of the wires and appliances and to be diligent therein. [Citations.] And, in the places where there is a probability of injury, they must not only make the wires safe by proper insulation, but as stated in *Dow* v. *Sunset Tel. & Tel. Co.*, 157 Cal. 182, 186 [106 P. 587], 'keep them so by vigilant oversight and repair.' '' In the Polk case defendant city's power line extended along the line of a city street right of way, and passed through the branches and foliage of trees growing on private property but spreading over the street. The wires, located some 42 to 45 feet above ground, were insulated. Plaintiff, a workman engaged by the property owner to trim the trees, was injured when his pruning hook touched a section of the wires from which the insulation had been worn off by friction with one of the tree limbs; judgment in his favor was affirmed.

■ In *Lozano* v. *Pacific Gas & Elec. Co.* (1945), 70 Cal.App. 2d 415, 420, 422 [161 P.2d 74], in which two workmen were killed when a light tower they were pushing came in contact with an uninsulated wire 43 feet above ground and running over their employer's land, it is declared that the defendant company's duty ''to use care so as to avoid injury to persons or property was established by a clear showing that the company owned, maintained and operated the power line in question. [Citations.] Such duty extended to every person rightfully on the premises and was obviated only as to trespassers and individuals unlawfully there at the time of injury. [Citations.] . . . ■ The right of way granted to the company to construct, maintain and service its lines on or over the customer's private property was not exclusive of the ordinary use of the property by said owner and its agents or

servants. [Citations.]'' After referring to the principles quoted hereinabove from the Polk case, the court continues, ''The duty of due care with which the company was charged consists not only in the proper installation of the dangerous instrumentality but in the maintenance thereof in a safe condition at all times and places and under the changing circumstances of the particular case. Even if at the outset of the installation of equipment the company may have been entirely free from fault, yet, if, under changing circumstances, a hazardous condition arose, nonaction or the failure to remedy such condition would constitute culpable negligence. [Citations, including the Polk case, *supra*.]'' In the Lozano case one of defendant power company's agents had learned, some two to four months before the accident, that the light towers being used in the employer's operations on his land were higher than the agent had assumed them to be. Judgment against the company on jury verdicts, was affirmed.

Despite the holdings of the Polk and Lozano cases defendant urges that the park district and its employes in making the fill were trespassing upon defendant's right of way. It is true that the making of the fill with resulting impaired clearance below the wires was not ''the ordinary use of the property by . . . [the] owner and its agents or servants,'' but this fact alone is not an adequate answer to the problem. Defendant relies on *Pacific Gas & Elec. Co.* v. *Minnette* (1953), 115 Cal.App.2d 698, 701 [252 P.2d 642], but that case determines nothing which is controlling here. There, the grantors of the easement had covenanted with the company not to ''erect or maintain any building or other structure on the right of way'';[2] subsequently a building was erected directly beneath the company's wires, with its roof only four feet below them. The company sued to quiet title

---

[2]In the present case the grant of defendant's easement reads as follows: ''EAST BAY REGIONAL PARK DISTRICT, a California park district, hereinafter called first party, does hereby grant to PACIFIC GAS AND ELECTRIC COMPANY, a California corporation, hereinafter called second party, its successors and assigns, the right to erect, maintain, replace, remove and use a line of poles with all necessary and proper crossarms, braces, anchors, guys and other appliances and fixtures for use in connection therewith, and to suspend therefrom, maintain and use such wires as second party shall from time to time deem necessary for the transmission and distribution of electric energy, together with a right of way along said line of poles, over and across those certain premises, situate in the County of Contra Costa, State of California, which are described as follows: [Description.] Said right includes the trimming by second party of any trees along said poles and wires whenever considered necessary for the complete enjoyment thereof.''

to its easement and for a mandatory injunction requiring removal of the building. No question was before the court relative to the duty or liability of the company in respect to a continuing dangerous condition which the company had not created but which involved its property and of which it had notice.

*Youngstown Steel etc. Co.* v. *City of Los Angeles* (1952), 38 Cal.2d 407 [240 P.2d 977], holds that the owner of property over which defendant city held a right of way to erect and maintain power poles and wires was obliged to pay the cost of raising the wires where such raising was desired by it in order to permit it to safely operate a new and higher type of crane, but does not suggest that a power company whose wires became a hazard under the circumstances present in the instant case could refrain from moving them to a safe height despite the fact that the property owner whose operations created the hazard may be liable for the cost of the change. ■ We are persuaded that in view of the extremely dangerous character of wires carrying high voltage electricity the better and more humane rule is that stated in *Bickham* v. *Southern Cal. Edison Co.* (1953), 120 Cal.App. 2d 815, 820 [263 P.2d 32] : that after such a hazard comes to the knowledge of the power company it is required to so raise the wires as to make them comply with the safety order (General Order 95) and that "it is inconceivable" that the power company would refuse to make such a change. The fact that the property owner in creating the hazard caused by an impaired clearance is guilty of negligence proximately contributing to personal injuries thereafter resulting should not, and we believe does not, operate to relieve the power company from liability for an unreasonable delay (if there was such) in raising the wires. Indeed, in oral argument before this court, defendant conceded its duty to raise the wires as "to certain people," although arguing that the duty did not extend to Dunn by reason of the latter's alleged contributory negligence.

On this point defendant contends that as to it Dunn was a trespasser to whom its only duty was to abstain from wilful or wanton injury, but that even if he be considered an invitee defendant had fulfilled its duty by warning him of the danger. (See *Raber* v. *Tumin* (1951), *supra*, 36 Cal.2d 654, 658; *Popejoy* v. *Hannon* (1951), 37 Cal.2d 159, 170 [231 P.2d 484].) In *Hall* v. *Southern Cal. Edison Co., Ltd.*, (1934), 137 Cal.App. 449 [30 P.2d 1013], plaintiff, an em-

ploye of an electrical contractor, was sent to disconnect the electrical power from a pump-house which the owner wished to dismantle so the pump could be moved. Plaintiff climbed defendant's power pole and cut the wires at a point where live wires would not be left lying on the ground. With the support of the wires thus removed, the pole, later discovered to have been partially decayed, broke and fell to the ground, injuring plaintiff. Plaintiff was held to have been a trespasser as to defendant, and judgment of nonsuit was affirmed. In *Strother* v. *Pacific Gas & Elec. Co.* (1949), 94 Cal.App.2d 525, 529 [211 P.2d 624], it was held that plaintiffs had failed to state a cause of action for deaths resulting when an airplane, while approaching an air field and attempting to land, collided with wires maintained by defendant over its own land and some 26 feet above the ground; the court declared that "Being trespassers, the owner of the land owed plaintiffs no duty to warn them of the hazard of the wires." And in *Leslie* v. *City of Monterey* (1934), 139 Cal.App. 715, 720 [34 P.2d 837], defendant city, which owned and operated a baseball park, awarded a contract for the erection of a fence and backstop around the park. Plaintiff was an employe of the contractor. The fence had been moved five feet into the street from the property line, and plaintiff was injured when a steel pole which he was helping to raise into place at one point along the fence came into contact with an overhead 22,000-volt line. A nonsuit was granted in favor of the city, and on appeal plaintiff's judgment against defendant power company, who owned and maintained the wires, was reversed upon the authority of the Hall case, *supra,* with the declaration that plaintiff was a trespasser. ▆ However, since the evidence in the present case does not show that Dunn himself contacted or caused a contact with defendant's wires, we are convinced that in accord with the principles enunciated in the Polk and Lozano cases a finding is not compelled as a matter of law that Dunn, who was lawfully upon the park property, was a trespasser as to defendant power company. (See also *Jackson* v. *Utica Light & Power Co.* (1944), 64 Cal. App.2d 885, 889 [149 P.2d 748]; *Langazo* v. *San Joaquin L. & P. Corp.* (1939), 32 Cal.App.2d 678, 685-690 [90 P.2d 825].) And this is true even if we assume that defendant's easement carried with it a right to have the established clearance of its wires remain unimpaired until it had notice and a reasonable opportunity to raise the wires (presumably at the expense of the park district) to legally accommodate the proposed fill,

and even if we assume (we do not so decide) that the park district was a trespasser when it impaired the clearance without notice.

 In view of the rules noted hereinabove, it thus appears that unless the evidence is as a matter of law insufficient to sustain a finding that defendant was negligent in having allowed the danger to remain for an unreasonable length of time before raising the wires, the question of defendant's negligence should have gone to the jury. Plaintiff offered no evidence as to what would constitute a reasonable time within which defendant should have installed the new poles to raise the wires, but rested upon the showing that the installation was commenced "shortly after" the accident and some 27 hours after the hazardous condition came to the attention of defendant's foreman on Thursday morning.[3] This proof is slight but regardless of what we, or some of us, might think we should find if the question were before us as triers of fact, we are persuaded as a court of review that the matter of whether or not the delay was reasonable should not be determined as a matter of law upon defendant's motion for a nonsuit, but instead should go to the jury after, of course, defendant is first afforded opportunity to produce evidence that it acted promptly and with due care under the circumstances.

Cases relied upon by defendant in support of its further contention that the sole proximate cause of Dunn's fatal accident was Hickman's act of driving his dump truck under the wires where the elevated bed could touch them, rather than any negligence by defendant, appear to involve situations where defendant had no reason to anticipate danger, or else no duty to make changes in the location or elevation of its wires in order to accommodate the convenience of others in their operations carried on in close proximity to the wires. (See *Pascoe* v. *Southern Cal. Edison Co.* (1951), 102 Cal.App.2d 254, 258-259 [227 P.2d 555]; *Hayden* v. *Paramount Productions, Inc.* (1939), 33 Cal.App.2d 287, 291-292 [91 P.2d 231]; *Stasulat* v. *Pacific Gas & Elec. Co.* (1937), 8 Cal.2d 631, 637-638 [67 P.2d 678]; *Stackpole* v. *Pacific Gas & Elec. Co.*

---

[3] There was also evidence that after defendant's superintendent, Rucker, inspected the area on Thursday afternoon he asked his supervisor to have an "estimator" meet the park district official Flood, but whether this relates to discussions with the district as to bearing the cost of changing the wires or, if it did so, whether it contributed to any delay in action by defendant, is not shown.

(1919), 181 Cal. 700, 705 [186 P. 354]; *Sweatman* v. *Los Angeles Gas & Elec. Corp.* (1929), 101 Cal.App. 318, 326 [281 P. 677].) In *Benard* v. *Vorlander* (1948), 87 Cal.App. 2d 436, 440-441 [197 P.2d 42], the pole line and wires involved were owned and maintained by the government rather than by the power company, which only energized them. By contrast, defendant in the present case was obliged after learning of the generally dangerous condition existing after the filling operations, to place its wires in a safe condition under the changed circumstances, and the questions of whether it acted with reasonable promptness and of proximate cause should, as stated hereinabove, have been submitted to the jury. The danger which existed here was of the very nature admittedly realized by defendant's agents when they discovered the impaired clearance, and against which they warned Dunn and others concerned. (See *Jackson* v. *Utica Light & Power Co.* (1944), *supra,* 64 Cal.App.2d 885, 891-894.)

Finally, defendant contends that in view of the repeated warnings given Dunn, his participation in the filling operations, and his specific knowledge of the danger, contributory negligence on his part was shown as a matter of law. In the first place, however, there were no eyewitnesses to the acccident and no evidence as to why or how Dunn came in contact with the electricity and plaintiff suggests that he may have been attempting to save Hickman. (See *Petersen* v. *Lang Transp. Co.* (1939), 32 Cal.App.2d 462, 467-468 [90 P.2d 94].) In any event plaintiff was entitled to rely upon the statutory presumption that Dunn was exercising due care (see Code Civ. Proc., § 1963, subd. 4) and to have the jury so instructed. (*Scott* v. *Burke* (1952), 39 Cal.2d 388, 394-395 [247 P.2d 313]; *Jackson* v. *Utica Light & Power Co.* (1944), *supra,* 64 Cal.App.2d 885, 894-896.) Further, in *Polk* v. *City of Los Angeles* (1945), *supra,* 26 Cal.2d 519, 524, 529-532, in which plaintiff tree trimmer knew of the dangerous character of the wires, saw a sign stating that those in question carried a high voltage, and knew that insulation was likely to be worn where rubbed by a tree limb, it was held that the question of contributory negligence depends upon the circumstances in each case, and had properly been submitted to the jury. (See also *Monroe* v. *San Joaquin L. & P. Corp.* (1941), 42 Cal.App.2d 641, 650 [109 P.2d 720].) In *Rojas* v. *Southern Cal. Edison Co.* (1951), 105 Cal.App. 2d 258, 259 [233 P.2d 141], plaintiff himself testified that he unintentionally brought his aluminum walnut shaker, over

33 feet in length, in contact with the wires overhead, although he understood the danger and had meant to avoid the wires; the court's declaration that one who "voluntarily contacts the wire" after a warning is guilty of contributory negligence as a matter of law is not controlling here, where, as stated above, the exact circumstances surrounding the accident are not completely shown and plaintiff is entitled to rely on the presumption of due care.

It appears that each of the cases involving injuries from contact with high tension wires has largely turned on the particular facts involved, and we conclude that upon the evidence in the record now before us the questions of negligence, proximate cause, and contributory negligence should have been submitted to the jury.

The judgment appealed from is reversed, and the purported appeal from the order granting "motions for a judgment of non-suit" is dismissed.

Shenk, Acting C. J., Edmonds, J., Carter, J., Spence, J., and Schottky, J. pro tem.,* concurred.

TRAYNOR, J.—I concur in the judgment and in the opinion, except for the reference to the presumption of due care. Since the burden of proof on the issue of contributory negligence was on defendant, no proper purpose is served by invoking the presumption. (See dissenting opinion in *Speck* v. *Sarver,* 20 Cal.2d 585, 590 [128 P.2d 16].)

Respondent's petition for a rehearing was denied August 19, 1954.

*Assigned by Chairman of Judicial Council.