[L. A. No. 23223. In Bank. July 29, 1955.]

RAYMOND E. HILYAR, a Minor, etc., Appellant, v. UNION ICE COMPANY (a Corporation) et al., Respondents.

Elconin & Elconin, Benjamin Elconin, Hirson & Horn and Theodore A. Horn for Appellant.

George P. Kinkle and George P. Kinkle, Jr., for Respondent Union Ice Co.

Crider, Tilson & Ruppe and E. Spurgeon Rothrock for Respondent Ingram.

CARTER, J.—This is an appeal by plaintiff from judgments of nonsuit entered in favor of defendants Charles Irwin Ingram (sued as Charles Irwin *Ingerman*) and Union Ice Company for damages for personal injuries.

Plaintiff, a 5½-year-old boy, was run over, or hit, and seriously and permanently injured by an ice truck driven by defendant Ingram. The only question involved is whether there was sufficient evidence of negligence on the part of Ingram to permit the case to go to the jury. A subsidiary question is whether there was sufficient evidence of an agency relationship between defendant Ingram and defendant Ice Company to submit that issue to the jury.

There were no eyewitnesses to the accident which occurred in the early afternoon, around 2 o'clock and the evidence is almost without conflict. The record shows that plaintiff, and his family, lived in a trailer camp or park which was privately owned. The trailer camp contains two north-south roads ("C" and "B") about 20 or 22 feet wide which are unpaved and full of chuckholes and bumps and ruts. These roads have neither curbs, nor sidewalks and are used by both pedestrian and vehicle traffic. On either side of each street are the trailer houses. There is a road running east and west at the southern end of the camp. The Hilyar trailer was located on the east side of "C" street, the small north-south road on the west side of the camp. The only bath and toilet house in the camp is located in the southwest corner of "C" street at its most northerly end. Plaintiff's mother was visiting in a trailer located on the westerly side of "B" street and had permitted plaintiff to go to the bathhouse alone as he had often done before if, as she testified, he would come right back. Defendant Ingram, driving a truck bearing the name "UNION ICE" in large block letters on both its doors, was delivering ice to the trailer on the southwest corner of

''C'' street; this trailer was directly opposite that in which the Hilyars lived. Driver Ingram testified that after he had delivered the ice, he walked around from the right side of his truck to the back; that there were children playing around it and that he warned them to get away from the truck; that he then got back ''up'' on the truck and started the motor; that he ''glanced in my mirrors and headed south for a few feet and made my left-hand turn east.'' This testimony shows that he was driving south, that he turned to the left into the east-west street and proceeded in an easterly direction. He testified that he looked through the mirrors when he started up; that he looked out of the truck to see if there were any children to the right or left of the truck; that he was driving in second gear at from 3 to 4 miles an hour; that he did not sound his horn. He testified that he drove along the east-west street until he came to ''B'' street, a distance of about 65 feet, and that he again made a left-hand turn in order to proceed in a northerly direction on ''B'' street. The record shows that as he made the turn onto ''B'' street, he did not sound his horn, nor did he look to see if there were any children on the right, or around the truck and he didn't see any children; that as he was about 20 feet from the corner (where he made the turn) the first he knew that anything unusual had happened was when he heard ''some kind of noise in the back'' and a little boy (not the injured child) ''hollered'' at him that something had happened ''back there''; that he jumped out of the left, or driver's, seat of the truck and started down toward where the injured child was lying calling for help. The injured child was lying on the road in a prone position about 20 feet from the corner and approximately 2 feet from a picket fence on the easterly side of the street. The record shows that right after the accident defendant Ingram kept yelling ''My God! My God! I hit him.'' Mrs. Hilyar testified that plaintiff, immediately after the accident, said ''I was walking and the truck hit me''; that the accident occurred ''not more than ten minutes'' after the child had left for the bathroom. The child failed to qualify as a witness and by stipulation a statement made by him to police officers not long after the accident was admitted in evidence. The admitted portion of the statement consisted of the following: ''Stated he was walking alongside an ice truck and the truck turned a corner knocking him to the ground and ran over his back. Stated he was also knocked into the fence at his right side. Victim. . . .''

The record shows that defendant Ingram had delivered ice to the trailer court for approximatley three years; that he knew children played in the area. It is also shown that the truck was a high-bed model with solid sides and a closed cab some distance from the ground. There were running boards underneath both doors. The overall length was approximately 15 feet.

Bearing in mind that this is an appeal from judgments of nonsuit and the rule that ". . . a nonsuit may be granted only when, disregarding conflicting evidence, giving to plaintiff's evidence all the value to which it is legally entitled and indulging in every legitimate inference which may be drawn from that evidence favorable to plaintiff's case, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff" (*Dunn* v. *Pacific Gas & Elec. Co.*, 43 Cal.2d 265, 268 [272 P.2d 745]; *Palmquist* v. *Mercer*, 43 Cal.2d 92, 95 [272 P.2d 26]; *Warner* v. *Santa Catalina Island Co.*, 44 Cal.2d 310 [282 P.2d 12]) we must look at plaintiff's evidence and the inferences to be drawn therefrom in order to determine whether it can be said as a matter of law that there is no evidence of negligence on the part of defendant Ingram.

Ingram was aware that children played in the area of the streets of the trailer camp; he was aware that there were children around his truck when he started to drive from "C" to "B" street; he admitted he had not sounded his horn; that he did not look for children on the right of the truck, nor around it. From the pictures of the truck in evidence, it could have been logically inferred that because of its height and the distance of the cab windows from the road, that a small child could have been directly in front of the cab, or at either side, without being seen by the driver unless he were keeping a close watch for children. The only direct evidence of care exercised by the driver is his testimony that he looked in his rear-view mirrors for children when he first started up. There is no evidence that after starting he looked out the side windows, or the front windshield. From this the trier of fact could have determined that when looking through the mirrors, he might have missed seeing a small child directly in front of him. There is evidence that at no time did defendant Ingram sound his horn to warn children away from the moving vehicle. From the child's statement that the truck hit him and ran over his back, it could have been reasonably inferred that he was either in front of the

truck as it made the turn, or slightly to its left. From defendant Ingram's testimony that he did not see the child, it could have been inferred that he did not see the child because he was not exercising the care commensurate with the danger to be avoided in that he knew small children played in the area and knew, or should have known, that children are unpredictable (*Shannon* v. *Central-Gaither U. Sch. Dist.*, 133 Cal.App. 124 [23 P.2d 769]).

The police officer, Thomas, testified that in Ingram's signed statement to him concerning the accident, he had stated that he was driving between 4 and 5 miles an hour. The jury may very well have believed this statement concerning the speed of the vehicle and have concluded that such speed was not the exercise of due care under all the circumstances.

All persons are required to use ordinary care to prevent others being injured as the result of their conduct; ordinary care is that degree of care which people of ordinarily prudent behavior can be reasonably expected to exercise under the circumstances of a given case. In other words, the care required must be in proportion to the danger to be avoided and the consequences that might reasonably be anticipated (*Crowe* v. *McBride*, 25 Cal.2d 318, 321 [153 P.2d 727]; *Hatzakorzian* v. *Rucker-Fuller Desk Co.*, 197 Cal. 82, 98 [239 P. 709, 41 A.L.R. 1027]; *Warner* v. *Santa Catalina Island Co., supra*, 44 Cal.2d 310; *Jensen* v. *Minard,* 44 Cal.2d 325 [287 P.2d 7]).

In *Conroy* v. *Perez,* 64 Cal.App.2d 217, 224 [148 P.2d 680], it was held that ''The presence of children is in itself a warning requiring the exercise of care for their safety. (*Seperman* v. *Lyon Fire Proof Storage Co.*, 97 Cal.App. 654 [275 P. 980].) Moreover, if the evidence shows that a driver has knowledge of the presence of children he may be held to have been responsible although it appears that he did not see the injured child in time to prevent the injury. (See 2 Cal.Jur. 10-Yr. Supp., p. 454.) This is especially true where the injury occurs in or about the child's home. (*Cambou* v. *Marty,* 98 Cal.App. 598 [277 P. 365].)''

There can be no question but that here the driver of the ice truck knew that children were playing in the area. He, himself, testified that he had warned the children away from the truck; he also testified that he had not sounded his horn from the time he started it up until the plaintiff was hit. The accident occurred not far from the child's home. It was daylight, the view was unobstructed, and the trier of fact

might well have concluded that the driver's conduct under the circumstances, was not the degree of care required of one using a dangerous instrumentality in the immediate vicinity of small children (*Jensen* v. *Minard, supra,* 44 Cal.2d 325).

Section 671, subdivision (b), of the Vehicle Code provides that the driver of a motor vehicle when reasonably necessary to insure safe operation shall give audible warning with his horn. Whether under the circumstances here presented it was "reasonably necessary" to sound the horn to "insure safe operation" should have been a question of fact for the jury. In *Ducat* v. *Goldner,* 77 Cal.App.2d 332, 335 [175 P.2d 914], it was held that "appellant had no right to assume that the road was clear but it was his duty to be vigilant and to anticipate the presence of others in the highway. The fact that he did not know that respondent was in the street is no excuse for his failure to give warning (*Rush* v. *Lagomarsino,* 196 Cal. 308, 317 [237 P. 1066]; *Myers* v. *Bradford,* 54 Cal.App. 157, 159 [201 P. 471]). . . ." It was there held that the darkness of the streets and the condition of the weather required that a reasonably prudent person should sound his horn to insure the safe operation of his vehicle when turning a corner at a place where a pedestrian might reasonably be expected to be found. In *Freeland* v. *Jewel Tea Co.,* 118 Cal.App.2d 764, 769 [258 P.2d 1032], it was held that it is ordinarily necessary to exercise greater care for the protection and safety of young children than for adult persons possessing normal and mature faculties (*Conroy* v. *Perez, supra,* 64 Cal.App.2d 217, 224); that their conduct is unpredictable and one operating a motor vehicle should anticipate their thoughtlessness and impulsiveness (*Shannon* v. *Central-Gaither U. Sch. Dist., supra,* 133 Cal.App. 124). It was also held that the presence of children is in itself a warning requiring the exercise of care for their safety. The court concluded that where children were known to be playing in the street, the negligence, if any, of the driver of a motor vehicle was a question of fact for the jury. In *De La Torre* v. *Valenzuela,* 102 Cal.App.2d 586 [228 P.2d 13], it was held to be a question of fact for the jury whether or not under all the circumstances defendant's failure to sound a horn proximately contributed to plaintiff's injury.

It has been held in numerous cases that the issue of proximate cause is essentially one of fact (*De La Torre* v. *Valenzuela, supra,* 102 Cal.App.2d 586, 591; *Fennessey* v. *Pacific Gas & Elec. Co.,* 20 Cal.2d 141 [124 P.2d 51]; *Mosley* v. *Arden*

*Farms Co.*, 26 Cal.2d 213, 219 [157 P.2d 372, 158 A.L.R. 872] ; *Crowe* v. *McBride, supra,* 25 Cal.2d 318, 321; *Warner* v. *Santa Catalina Island Co., supra,* 44 Cal.2d 310; *Dunn* v. *Pacific Gas & Elec. Co., supra,* 43 Cal.2d 265, 278). ██ Under the circumstances here presented, whether or not defendant driver's failure to sound the horn, or his failure to look more closely for children in his way, constituted the proximate cause of plaintiff's injuries should have been submitted to the jury. As the court said in *Fredericksen* v. *Costner,* 99 Cal.App.2d 453, 458 [221 P.2d 1008], whether defendant was negligent in starting his truck without making any further effort to ascertain the conduct and whereabouts of the plaintiff's decedent was a question of fact. "It cannot be said, as a matter of law, that he exercised the degree of care which a reasonable person would have exercised under similar circumstances to protect Cheryl [decedent] from harm. The case presents a question of fact which should have been left to the jury."

Defendant Ingram contends that a verdict and judgment cannot rest upon conjecture and speculation. He argues that there is no evidence concerning the point of impact. ██ In *Dunn* v. *Pacific Gas & Elec. Co., supra,* 43 Cal.2d 265, 278-279, it was held that an absence of eyewitnesses and evidence as to the manner in which the accident occurred was not fatal to plaintiff's case. ██ In *Sanders* v. *MacFarlane's Candies,* 119 Cal.App.2d 497, 500 [259 P.2d 1010], where a judgment of nonsuit was reversed, and where there were no eyewitnesses, it was said: " 'It is not necessary, in order to establish a theory by circumstantial evidence, that the facts be such and so related to each other that such theory is the *only* conclusion that can fairly or reasonably be drawn therefrom. . . .' " (*Katenkamp* v. *Union Realty Co.,* 36 Cal.App.2d 602, 617 [98 P.2d 239].) ██ "The plaintiff relying on circumstantial evidence does not have to exclude the possibility of every other reasonable inference possibly derivable from the facts proved. (*Vaccarezza* v. *Sanguinetti,* 71 Cal.App.2d 687, 692 [163 P.2d 470] ; *Spolter* v. *Four-Wheel Brake Serv. Co., supra,* [99 Cal.App.2d 690 (222 P.2d 307)], at p. 694.)" (*Sanders* v. *MacFarlane's Candies, supra,* 119 Cal.App.2d 497, 500; see also *Summers* v. *Tice,* 33 Cal.2d 80 [199 P.2d 1, 5 A.L.R.2d 91].)

Defendant Ingram relies upon *Greene* v. *Atchison, T. & S. F. Ry. Co.,* 120 Cal.App.2d 135, 142 [260 P.2d 834, 40 A.L.R.2d 873], in support of his theory that a judgment for plaintiff here would be the result of conjecture and specula-

tion. In the Greene case, plaintiff's decedent was found lying near the railroad tracks. There were no witnesses; there was only the inference, from the position and condition of the body, that a train, or some portion thereof, must have struck the decedent. The court there held that if there was any evidence, including reasonable inferences therefrom, that would support a finding of defendant's negligence, the judgment of nonsuit must be reversed. The Greene case is easily distinguished from the one under consideration. Here we have the child's statement to the officers and his mother that the truck ran over him; we have the driver's statement "I hit him!"; we have the driver's statement of his knowledge of children playing in the area and that he did not sound his horn, and that he did not look to the right or left as he made his left-hand turn into "B" street. From this evidence it is reasonably inferable that had he looked, he would have seen the plaintiff, or that had he sounded his horn, he would have warned the child away from the moving truck.

Defendant driver also argues that there is no evidence relating to the point of impact. There is no merit to this argument because from the evidence relating to the condition and position of the child's body, and from his statements to his mother and the police, and from Mrs. Hilyar's testimony that the child was lying about 2 feet from the picket fence, it could be reasonably concluded that the child was hit close to the corner of "B" street at its intersection with the east-west street about 20 feet therefrom. Because the evidence shows that the child was on his way back from the park bathroom and that there was only the dirt road on which to walk, the inference is that he was walking in the street at the time he was struck by defendant's truck.

Plaintiff contends, and defendant Union Ice Company denies, that an agency relationship existed between Ingram and the company. The record shows that on both doors of the cab of the truck appeared a shield with the words "UNION ICE" in large block letters. Printed in much smaller letters just over the sign, appeared the name "Chas. Ingram" and in letters of approximately the same size, underneath the words "UNION ICE" appeared the word "Distributor." The shield on which these words were painted was red, white and blue, apparently the colors of the Union Ice Company From the photographs, it appears that the words "Chas. Ingram" and "Distributor" had been painted in a rather

amateurish fashion, while the words "UNION ICE" appeared to have been done professionally. The evidence appears to be without conflict that the truck was owned by Ingram; that Union Ice Company furnished no parts, tires, repairs, or any parking space therefor.

A contract, or agreement, existed between defendant Ingram and defendant Union Ice Company. It was provided therein that Ingram was designated as the "Distributor" and the company as the "Manufacturer." It appeared that Union Ice had entered into similar contracts with other distributors by which they were given certain territories in which to sell ice. The agreement provided that the manufacturer would "sell" ice to the distributor who would "buy" it at certain prescribed prices and sell it at retail at "such reasonable prices· as shall yield a reasonable profit unto the Distributor, and in no event at a minimum price lower than that for which the Manufacturer itself sells ice at retail to the.same classes of trade as served by the Distributor, as set forth . . ." on current schedules. The agreement provided it was to continue for a five-year period; that it was not assignable without the manufacturer's consent; and that if the distributor desired to sell his "ice merchandising and distributing business," the manufacturer was to be given ten days' notice and an option to purchase at the terms offered by any prospective purchaser. The agreement provided that the distributor was to give his "faithful, active and conscientious personal attention to the sale and distribution" of ice in his own territory. It was provided, also, that he was not to sell out of his territory. Any failure to comply with the terms of the contract was to be considered a breach thereof for which the contract might be terminated. The contract provided that each distributor was an independent contractor and that it was not intended to create the "relationship of employee and employer, principal and agent, or that of master and servant."

Defendant Ingram testified that he had distributed ice manufactured by Union Ice Company since 1951; that he had handled no other ice; that he took ice out on one day and paid for it the next morning; that he had no regular hours; that at a time when he had employed others, he had not checked with the company. Police Officer Thomas testified that Ingram had signed a statement a few hours after the accident in which he had said that he was employed by the Union Ice Company giving its address and phone number.

Paul W. Easton, vice president and general manager of the company, testified (by deposition) that distributors were authorized to use the sign "Union Ice Products" on their trucks; and that after the accident defendant Ingram made a report thereof to some official of the company.

Plaintiff relies principally on the case of *Smith* v. *Deutsch*, 89 Cal.App.2d 419 [200 P.2d 802], in support of his theory that the evidence of agency was sufficient to submit the issue to the jury. Defendant ice company relies upon the case of *Mountain Meadow Creameries* v. *Industrial Acc. Com.*, 25 Cal.App.2d 123 [76 P.2d 724], as negating the agency relationship. These cases will be discussed.

In the Smith case, *supra*, plaintiff was struck by a taxicab painted in the distinctive colors adopted by the cab company for cabs operated by the association. The words "War Veterans Taxicab" were painted on the sides of each cab. It was held that this evidence was sufficient evidence of ownership. An officer of the War Veterans Taxicab Association testified that the association never had a franchise in Los Angeles; that it owned no cabs; that it had no stands from which cabs were dispatched; that it did not direct cabs to any location; that it did not receive a percentage of what the drivers received in revenue; that members operated their own cabs; that the driver of the cab in question was not a member of the association. Other evidence showed that the driver drove the cab with the knowledge and consent of defendant association. After the accident, an association supervisor's car drove to the scene, showed his card to police officers and made measurements, etc.; he remained until a tow car removed the taxicab. It was noted by the court that the by-laws of the association showed that the association exercised powers of control over the drivers and that one of the grounds for expulsion of members was the "inability to perform the duties for which the member of this association was expressly employed to do." The court relied on the case of *Callas* v. *Independent Taxi Owners' Assn., Inc.*, 66 F.2d 192 [62 App.D.C. 212], in which the "situation [was] almost identical with that in the instant case that the liability of the defendant was a question of fact to be determined by the jury; that it was not a question of law; that plaintiff's case rested on the presumption of ownership arising from the fact that the cab bore its name and colors; that the presumption was evidence and was sufficient to take the case to the jury." The court concluded that the evidence

was so complete as to leave no doubt that Deutsch was operating under the direction and control of defendant association. In the case at bar there is no question concerning the ownership of the truck—the evidence is without conflict that it was owned by defendant Ingram.

In the Mountain Meadow case, *supra*, there was a contract between the Mountain Meadow Creameries, called the Producer, and one Dodge, called the Distributor. The producer granted to the distributor the right to sell dairy products in a certain territory; the distributor paid cash on delivery of the products to him; the distributor was required to purchase and maintain a delivery truck and to wear uniforms. The contract provided that it was not intended to create the relationship of principal and agent between the producer and the distributor. The contract provided that it might be terminated by giving written notice. The court said: "When we take the contract by its four corners and construe it as a whole, the conclusion is inescapable that the Mountain Meadow Creameries placed a milk route in possession of Dodge; that Dodge was required to purchase his supplies from the corporation and deliver them to the consumers within the district allotted to him. The corporation occupied the position of a wholesaler who furnished Dodge, a retailer, with an initial list of customers and sold him merchandise at wholesale prices. Dodge, the retailer, delivered these supplies to the customers and collected the retail prices from them." (P. 127.) The termination clause in the contract was construed by the court as not equivalent to the right of discharge possessed by an employer.

It appears to us that the Mountain Meadow case is more nearly analogous to the one under consideration than is the Smith case. In the case at bar, the uncontradicted facts show a wholesaler-retailer relationship. The only evidence to the contrary is Ingram's statement to the officer that he was "employed" by the Union Ice Company. In *Fesler* v. *Rawlins*, 43 Cal.App.2d 541, 544 [111 P.2d 380], it was said: "It is axiomatic that agency cannot be established by the declarations of the agent not under oath or in the presence of the principal. As stated in 1 California Jurisprudence, 698, 'if the rule were otherwise any rogue could use the name of an honest man to facilitate his roguery.'" See also *Mechem Outlines Agency* (3d ed.), § 112, p. 68.)

It follows that the nonsuit was improperly granted as to defendant Ingram in that the evidence was sufficient on the

issue of his negligence to permit the submission of the cause to the jury. The nonsuit as to the defendant Union Ice Company was properly granted in that there is no evidence of sufficient substantiality on the issue of agency to have permitted the cause to go to the jury.

The judgment in favor of defendant Ingram is therefore reversed, and the judgment in favor of defendant Union Ice Company is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., and Traynor, J., concurred.