Filed 12/11/20  Carracela v. Southern Cal. Edison Co. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MICHAEL CARRACELA, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> SOUTHERN CALIFORNIA EDISON COMPANY, <br><br> Defendant and Respondent. | B294297 <br><br> (Los Angeles County Super. Ct. No. BC588898) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Affirmed.

Boucher, Raymond P. Boucher, Maria L. Weitz; Aitken Aitken Cohn and Richard A. Cohn for Plaintiff and Appellant.

Leon Bass, Jr., Richard D. Arko; Murchison & Cumming, Friedrich W. Seitz, Gina E. Och; Greines, Martin, Stein & Richland, Robin Meadow and Eleanor S. Ruth for Defendant and Respondent.

_____

Michael Carracela appeals the summary judgment of his negligence claim against Southern California Edison Company (Edison). We affirm.

I

We recount facts and inferences in the light most favorable to Carracela. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)

Carracela suffered a serious electrocution injury while doing demolition work for a project replacing a bridge at the Port of Long Beach (the Port).

Carracela worked as a journeyman laborer for Miller Environmental, Inc., a subcontractor on the project. The general contractor was a joint venture of three companies: Shimmick Construction, Inc., FCC Construccion S.A., and Impreglio, S.p.A. The general contractor retained the corporation Safe Utility Exposure, Inc. to coordinate utility services. The Port retained Parsons Brinckerhoff, Inc. to manage construction of the project, including utility coordination. The Port also retained Safework, Inc. to oversee construction safety.

On July 24, 2013, Carracela was working on a particular part of the project: demolition and demolition clean-up for an overpass and off-ramp on a pier called Pier T. He and a coworker, Victor Cruz Bolanos, were in the basket of an 80- or 85-foot aerial boom lift. Bolanos operated the lift. Carracela had an air hose to clean concrete debris from the top of a partially demolished off-ramp. (The trial papers sometimes referred to this as an "on-ramp" but Carracela's appellate briefs refer to the "Pier T Off-Ramp." We refer to this area as the "off-ramp," "off-ramp bridge," and "overpass" throughout the opinion.) Carracela

was clearing debris off the top of the horizontal girders or I-beams that had supported the roadway.

A sign on the overpass read "15 FT 3 IN." A photo of the overpass shows the overpass sign attached to the side of girders. Bolanos said the girders were two feet "wide." A Miller safety director said the girders were four to five feet tall.

While Carracela and Bolanos were above the girders, a steel stud entangled the air hose. To disentangle the hose, Bolanos pulled the basket back and to his right. Then he went higher and extended the boom to create slack. In doing so, he raised the lift toward a power line. When he raised the lift, Bolanos was looking down through the basket for the hose and looking at his controls. At his deposition, Bolanos agreed he lost track of the power lines when he raised the lift.

Electricity arced from the line to Carracela. Bolanos estimated Carracela's head was 10 feet from the line.

Carracela sustained serious injuries, including electrical burns to his upper body, nerve damage in his writing hand, and a head wound that resulted in neurological damage.

Edison owned power lines in the area, including the one that injured Carracela. The line was a 12,000-volt line. There are different types of lines. This one was a distribution line.

Testimony about the line's height put it at 60 feet or more in the air. A photo of the overpass shows a roadway under the overpass and a lower road to the right. Carracela says there is a dispute about the distance between the top of the off-ramp bridge and the lines. We discuss this issue later in the opinion.

On July 22, 2015, Carracela filed a complaint against the general contractor, Edison, and others. The complaint alleged six

causes of action. Only the third cause of action, negligence, involves Edison.

The third cause of action says Edison "owned, operated, designed, manufactured, installed, tested, inspected, and maintained overhead electrical power lines that intersected the construction area" for the project, including the line above Carracela's worksite when he was injured.

Carracela said Edison breached its duty of reasonable care because it:

1) "negligently designed, manufactured, tested or failed to consider the results of testing, operated, inspected or failed to inspect, and maintained" the power line and/or the power system;

2) failed to provide "customary power line protection;"

3) allowed construction or demolition within the power line's path;

4) failed to dismantle the line in a timely manner;

5) failed to de-energize or insulate the line; and

6) failed to erect a barrier or to provide other warning devices to keep workers like Carracela from getting dangerously close to the line.

Carracela said harm to people who might accidentally make contact with an arc flash from the line was reasonably foreseeable. He alleged the negligence was a substantial factor in his injuries.

On May 1, 2018, Edison moved for summary judgment. It said Carracela could not prove duty, breach, or causation.

The court issued a tentative ruling and held a hearing on the motion on July 17, 2018.

The tentative ruling found Edison satisfied its initial burden of negating breach. The court noted Carracela "admitted . . . he has no evidence that PUC's General Order No. 95 was violated with respect to height requirements – i.e. the power lines were not lower than required by the PUC." It was undisputed Edison had no part in the demolition work and did not control Miller's equipment or the manner of Miller's work.

The court determined Edison negated the element of breach of duty. Three facts undergirded the court's reasoning: 1) Edison's power line complied with General Order 95 height requirements; 2) Edison lacked notice that workers were operating a boom lift next to power lines on the date of the incident; and 3) no one asked Edison to de-power the line.

The court addressed causation and duty but its ruling did not rest on these elements.

The court admitted declarations of two of Carracela's experts but concluded they did not create a triable issue. The court found the declarations did not refute the three pertinent facts we listed and it did not refute that Carracela and his coworkers knew about the power lines and knew they needed to stay at least 10 feet away.

At the hearing, the court granted a request by Carracela to continue the July 17, 2018 hearing to give counsel more time to review the tentative.

On July 30, 2018, Carracela applied ex parte to file an amended separate statement and additional supporting evidence. Some of the additional evidence was new and other evidence was from 2017. The court granted his request, continued the summary judgment hearing, and allowed Edison to respond.

Edison filed a supplemental reply.  An attachment to the reply included an e-mail exchange Carracela had referenced but not included in his papers.  Both sides say the e-mails help them.  In the exchange, the general contractor asked Edison project manager, Nolan Lam, if someone from Edison could be present during demolition at a "phase 1B transmission line" in case the poles "got hit by rubble or equipment."  This is not the line that injured Carracela.  The general contractor later e-mailed to say the demolition work was a "clear distance" from the overhead lines and they would not need a patrol person but might need it for future work.  Edison requested more information about the timing and scope of the work and said the general contractor would need to pay Edison before it could schedule this work.  On July 16, 2013, the general contractor responded and said it would not need an Edison patrol person for the next two weeks.

The court held the continued hearing on August 28, 2018.

At the hearing, the court asked Carracela whether he was arguing Edison breached its duty by not relocating the line.  Carracela responded "[t]hat is part of it, but it doesn't end there."  Edison could have de-energized the pole without affecting "anybody anywhere whatsoever under any circumstances."  Edison could have put "sleeves" on the lines.  Carracela did not specify which actions by Edison might have satisfied Edison's duty but stated, "[t]hey had an obligation and they did not -- they did not comply with that duty, they did not comply, and therefore, under the circumstances, summary judgment should be -- should be left for the jury to determine."

Edison disagreed.  It did not have to anticipate "every fortuitous circumstance that might happen."  "It is not an insurer of everybody's safety that may or may not work within the lines."

Edison denied having notice about the particulars of Carracela's work, such as the date of the work or the fact Carracela would be using an 80-foot lift under the lines. It attended meetings with the Port and the general contractor "about the project in general, but nothing about that particular location."

Edison asserted Miller, Carracela, and the lift operator, Bolanos, knew the lines were there and were energized. No one asked Edison to de-energize the lines, to put blankets on the lines, or to have someone patrol the area. The lines were already isolated and Edison did not need to do more.

Carracela made two concessions at the hearing. First, he agreed no one asked Edison to de-energize the line. Second, after the court asked whether Edison had actual notice workers were using lifts, Carracela said he "cannot represent to the court that [Edison] had actual notice that they were going to be using a boom lift on that day." Carracela asserted this was "a nonissue" because the only way to demolish such a ramp was with lifts, so Edison had constructive notice.

On August 30, 2018, the court adopted the tentative as its final ruling and granted Edison's motion for summary judgment. Carracela's new evidence did not establish Edison's lines were out of compliance with relevant regulations, did not show Carracela was unaware of the presence and location of the lines, did not show anyone notified Edison of work in the area, and did not show anyone requested the lines be de-energized.

II

Summary judgment was proper. Edison negated negligence per se and breach and Carracela failed to produce facts creating a material disputed fact on these elements.

7

To win summary judgment, a defendant must show the plaintiff cannot establish at least one element of a cause of action. (Code Civ. Proc., § 437c, subd. (o); *Aguilar*, *supra*, 25 Cal.4th at p. 853.)

To avoid summary judgment after a defendant makes the necessary showing, the plaintiff must present admissible evidence, not merely claims or theories, that reveal a triable, material factual issue. (E.g., *Torres v. Reardon* (1992) 3 Cal.App.4th 831, 836.)

Summary judgment motions are desirable. They can determine a case's merit without the cost and inconvenience of a trial. (See *Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542.) Whichever way the ruling goes, it usually gives parties extremely helpful information about the true value of the case. This facilitates settlement, which is good for the parties and for everyone else too.

Our review is independent. (*Aguilar*, *supra*, 25 Cal.4th. at p. 860.) Carracela has the responsibility as the appellant, though, to demonstrate the trial court's ruling was erroneous. (*Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 372.)

A

Edison negated negligence per se. Carracela did not allege this claim in his complaint. On the merits, Edison refuted negligence per se and Carracela failed to create any material factual dispute.

Negligence per se holds that statutes and regulations may establish duties and standards of care in negligence actions. (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 927 & fn. 8.)

Carracela's complaint does not include the words "negligence per se," nor does the complaint allege Edison violated

8

some statute or regulation. We nonetheless address this issue because Edison asserted it complied with the California Public Utilities Commission General Order 95 height requirements, the trial court discussed the General Order, and both parties briefed the issue of negligence per se on appeal.

Edison requested judicial notice of General Order 95, which we grant.

General Order 95 provides rules for overhead electric line construction. Within the order, rule 37 designates minimum vertical clearances for power lines based on voltage and location type. For example, high voltage lines and lines that cross railroads require more clearance.

We accept Edison's uncontested assertion that rule 37 of General Order 95 required the line in question to have a 25-foot clearance. Power lines of 12,000 volts, like the one at issue, require a 25-foot clearance if the lines cross or are along a thoroughfare. A lower eight-foot standard applies to situations involving non-walkable surfaces on bridges that do not ordinarily support conductors. The parties, however, did not brief this issue. As Edison noted in its respondent's brief, Carracela never disputed the 25-foot standard or offered a different clearance height. Edison, which would have less liability under a shorter standard, says the taller standard applies here. Although it was being demolished, the off-ramp bridge had been a thoroughfare. We apply the 25-foot standard.

Edison offered extensive evidence the lowest point of the line was more than 60 feet off the ground. We sample this evidence: Carracela estimated the line was 80 feet tall; a Miller safety director who measured the line using a laser tool about a week before Carracela was injured said it was above 60 feet tall;

9

and a Miller superintendent said it was over 65 feet from the roadway on which the boom sat. An Edison designer said he designed the line to ensure it met General Order 95 standards even at its lowest point.

Edison's separate statement referred to the "15-foot, 3 inch" bridge overpass. As we mentioned above, a sign on the off-ramp bridge read "15 FT 3 IN." Edison's respondent's brief cites testimony about the height of the girders to which the sign is attached. Edison acknowledges the largest estimate put the height at four to five feet tall. Using the maximum estimated height of five feet, the top of the supporting girders was 20 feet three inches.

The distance between the top of the off-ramp bridge, 20 feet three inches, and the lines—over 60 feet—was therefore at least 39 feet. This distance exceeds the 25-foot requirement. Edison refuted a claim of negligence per se based on General Order 95 height requirements.

Carracela disagrees about the distance between the top of the off-ramp bridge and the line. This disagreement flows from two supposedly contested issues about: 1) the height of the line, and 2) the height of the off-ramp bridge relative to where a pole entered the ground. Neither disagreement created a disputed issue of material fact.

We start with the height of the line. Carracela says the line was attached to a 64-foot cross arm. He contends, however, that due to sag the line was slightly lower than 64 feet. An Edison distribution planner said a line like this one could sag about three feet. Considering the facts in the light most favorable to Carracela, we calculate the line to be a minimum of 61 feet off the ground from the bottom of the pole. This figure is

consistent with Edison's contention that the minimum height was above 60 feet. It does not create a disputed material fact.

We turn to the height of the off-ramp bridge.

Carracela does not dispute the existence of the "15 FT 3 IN." sign. He says the top of the overpass girders were "at least 20 feet 3 inches" above the underpass roadway. He does not point to evidence that the height was *higher* than 20 feet three inches. In the light most favorable to him, we presume the height from the bottom to the top of the bridge deck was 20 feet three inches. Edison acknowledged this figure and it does not create a disputed material fact.

Carracela uses two flawed techniques to try to diminish the distance between the line and the off-ramp bridge.

First he tries to include his own height and facts showing his assigned work area may have been above the bridge deck. This misses the mark. Rule 37 of General Order 95 is about clearance from the "surface" of thoroughfares. The relevant inquiry is the distance between the surface of the off-ramp bridge and the line. Carracela's arguments about the clearance using his potential position above the bridge are irrelevant to the General Order's clearance requirement.

This is logical. Twenty-five feet is a relatively large clearance. The 25-foot clearance builds in the potential for something like a truck or a person of Carracela's height to be atop the surface. Carracela's claims about distances above the off-ramp bridge do not change the analysis about compliance with the General Order's height requirements.

Carracela's second flawed technique is to argue the bottom of the off-ramp bridge was higher than the elevation where the 64-foot pole went in the ground. To do so, he points to evidence of

11

an embankment. His argument relies on an unsupported assumption that the base of the pole was at the bottom of the embankment. He has neither acknowledged this assumption nor attempted to support it with evidence.

We review Carracela's evidence about the height of the surface of the off-ramp bridge to show why his second technique fails. The pertinent evidence is deposition testimony from a Miller superintendent and from a Miller safety director.

We start with the superintendent. Carracela directs us to a single page of deposition testimony, page "3AA 155." There is no page 155 in our third appendix. We assume he means page 688, which corresponds to an exhibit with a single page of the superintendent's testimony. The single page begins with the following exchange between Carracela's lawyer and the superintendent:

"THE DEPONENT: The clearance was 15 foot, 9.
BY MR BOUCHER:

Q And then from the roadway up the embankment was another approximately 15 to 18 --
A I -- I -- I guess. I mean -- pretty -- you know. Pretty -- you know, not much. I mean, you can -- you could tell -- I would say 15, 20 feet.
Q And that's the same estimate --
A Lower.
Q -- that we got from another witness that measured it . . . ."

The lawyer goes on to ask the superintendent about the width of an unspecified "I-beam" and then the exhibit ends.

We turn to the testimony of the safety director. Carracela points to "3AA 684." Page 684 in the third appendix is the cover

sheet for the safety director's deposition and contains no testimony. We assume Carracela means to refer us to the following page, another single page of deposition testimony. On this page, the safety director says there was "kind of like a rock embankment kind of on the side that goes up -- I'd estimate it around roughly 15 feet. And then that led to the on-ramp road."

Carracela also directs us to his amended response to Edison's separate statement. As a separate statement, those pages themselves provide no evidence. Further, those pages offer no citations to other evidence that show the location of the base of the pole.

Carracela incorrectly claims the testimony from the superintendent and from the safety director show the underpass roadway was 15 to 20 feet higher than the base of the pole. We agree with Edison, which pointed out that Carracela's argument relies on an assumption that Carracela's evidence neither supports nor addresses: that the base of the pole was on that lower area below the embankment. Neither the superintendent nor the safety director mention a pole or the location of the base of a pole in relation to the embankment they describe.

In his reply brief, Carracela repeats his argument that there are material factual disputes about the relative location and elevation of the utility pole and height of the off-ramp bridge deck. He fails to address Edison's counter that his position is based on an unsupported assumption about the pole's location. He identifies no evidence to support the assumption. Rather, he recites the same calculations based on the same unsupported assumption the base of the pole was on a lower level. Carracela's evidence is insufficient to create a disputed issue of material fact.

During oral argument, Carracela directed us to a photograph of the off-ramp bridge. This photo does not show the base of the pole nor does it show where the lines run. This evidence does not help Carracela prove his claim the place where the pole met the ground was 20 feet lower.

On appeal, Carracela also says he disputed Edison's compliance, not with the 25-foot height requirement, but with General Orders 95, 165, and 128's imposition of a duty to be "absolutely aware" of all hazards and to "prevent any accidental contacts."

Carracela has not identified the location of Order 165 or Order 128 within our record or otherwise told us how to find them. Nor has he directed us to the specific rules within the orders that he believes create a regulatory duty. We have not found Order 165 or Order 128 in the record. We cannot assess this claim, which Carracela has forfeited.

Carracela's claim as it pertains to General Order 95 fails. General Order 95 includes many broad prescriptions, like rule 31.1's requirement to follow "accepted good practice for the given local conditions known at the time." This and the other General Order 95 rules, which Carracela lists for the first time in his reply brief, merely restate the common law rule of due care and cannot support negligence per se. (*Perrine v. Pacific Gas & Elec. Co.* (1960) 186 Cal.App.2d 442, 447 (*Perrine*).)

In conclusion, Edison established Carracela could not prove negligence per se.

B

Edison negated breach.

A utility's compliance with the General Orders does not establish due care as a matter of law but merely relieves it of the

14

charge of negligence per se. (*Nevis v. Pacific Gas & Electric Co.* (1954) 43 Cal.2d 626, 630.) A utility's acts or omissions may still be negligent based on the particular circumstances of the case. (*Ibid.*)

To establish negligence, a plaintiff must show a legal duty to use due care, the breach of that duty, and proximate causation. (*Lozano v. Pacific Gas & Elec. Co.* (1945) 70 Cal.App.2d 415, 420.)

The standard of care for maintaining wires carrying electricity is to exercise the care a person of ordinary prudence would use under the circumstances. Those circumstances include the dangerous character of electricity and the inherent risk of injury from contact with electricity. This duty requires those controlling electricity to insulate wires properly everywhere injury is reasonably probable. Those maintaining wires also have a duty of reasonable, prompt, and diligent oversight. (*Polk v. City of Los Angeles* (1945) 26 Cal.2d 519, 525.)

Those maintaining a high power line need not, however, anticipate every possible fortuitous way the lines may cause harm. The standard is care commensurate with and proportionate to reasonably foreseeable consequences. Those in charge of the lines do not provide insurance against every possible accident. (*Perrine, supra,* 186 Cal.App.2d at p. 449.)

The *Perrine* decision shed light on when a utility breaches its duty. The court affirmed a judgment after a defense motion for a directed verdict. The plaintiff, a bricklayer, was burned after a 30-foot pole he was holding touched high-voltage wires. (*Perrine, supra,* 186 Cal.App.2d at pp. 444–445.) The power company was not liable because the lines complied with General Order 95 distance requirements. They were plainly visible and had warning signs. (*Id.* at p. 449.) The utility did not have

15

reason to know the equipment would be used in dangerous proximity to the wires.  The accident was not reasonably foreseeable given the particular facts of the case.  (*Ibid.*)

1

Edison's evidence negated breach.

Miller, Carracela, and Bolanos were generally aware of the line.  Bolanos recalled Miller discussed the line at a meeting the morning of the accident.  Carracela admitted in an interrogatory he was "generally aware" of the line's existence.

The power line was extremely visible.  The closer you got to the line, the more visible it became.  It was obvious what it was: a power line.  It was high off the ground.

Due to the elevated and visible nature of the line, Edison could not anticipate workers would get near it.

No one asked Edison to de-power the line.  Carracela conceded this fact at the summary judgment hearing.

Edison had confirmation from the general contractor's e-mails that certain demolition work was a "clear distance" from the overhead lines.  On July 16, 2013, the general contractor told Edison it would not need an Edison patrol person for the next two weeks.  This period covered the time of Carracela's accident.  Edison could not foresee harm when project authorities told it precautions were *not* necessary.

Edison was entitled to rely on the companies the general contractor and the Port retained to coordinate utility services and to oversee construction safety.  They were there, in part, to keep Edison aware of dangers and to coordinate issues like conflicts between demolition work and electricity lines.

Edison lacked knowledge about the specifics of demolition work, including the height of the lifts.  It did not know about the

16

demolition work involving Carracela at the Project on or before the incident and it had no part in the demolition work. Carracela conceded Edison lacked actual notice workers were using a boom lift that day.

Edison's project manager at the bridge site was one Lam. Lam said Edison played no part in demolition and would not have been involved in the scope, scheduling, sequencing, or performance of work relating to the demolition of the Pier T off-ramp. Edison did not know Carracela was doing demolition work on the Pier T off-ramp. Nor did it receive contemporaneous details about the accident.

George Perez, an Edison project manager, also said Edison did not know workers were using lifts. He did not know how workers would be performing demolition; he had "no clue."

2

Carracela makes many arguments but has no good answer to Edison's evidence refuting breach.

On appeal, Carracela says he raised material factual disputes regarding regulatory compliance and notice. We already have treated the issue of regulatory compliance, on which Edison prevails. Thus we turn to Carracela's notice issue.

a

We begin with an evidentiary point. The trial court properly excluded deposition transcripts from 2017 that Carracela offered for the first time in his amended opposition. To show notice, Carracela cited Exhibit U, excerpts from April 17, 2017 deposition testimony of Steve MacLennan. MacLennan was the person most qualified for Parsons Brinckerhoff, the corporation the Port retained to manage construction and coordinate utilities. Edison contested Carracela's inclusion of

17

this evidence because Carracela could have but did not include it in his first opposition. The court agreed and excluded the evidence.

In a footnote of his opening appellate brief, Carracela says the trial court's exclusion of Exhibit U was erroneous because the old evidence became relevant only after Carracela gained new evidence, which he did not have when he filed his initial opposition.

Carracela reasons thusly. One Salvatore Davi, who testified after Carracela filed his opposition, could not recall certain facts, which made the testimony of one Charles Fornelli relevant. MacLennan's testimony, in turn, provided "important context" about Fornelli's role in the project.

The court properly excluded Exhibit U. Carracela could have but did not include it in his first opposition. Interests of efficiency and fairness made exclusion proper.

Carracela misinterprets what the deposition says about Fornelli. MacLennan's testimony does not identify Fornelli as a utility coordinator. Rather, Carracela asked MacLennan whether Fornelli was involved in coordinating utility relocation and MacLennan responded "[t]he utility coordination, again, that would have fallen under Frank Goodwin." The court properly excluded this evidence, which did not provide facts about Fornelli.

Carracela's opposition cited Exhibit U to challenge Edison's notice. We do not rely on the exhibit for this purpose. Carracela said MacLennan's deposition showed that a goal of utility coordination was to identify conflicts between existing utilities and construction. He cited MacLennan again to support the proposition the general contractor and Edison shared their work

progress to mitigate conflicts. Mitigation could include re-sequencing Edison's work. Carracela does not and cannot explain how his citations to MacLennan for these propositions were irrelevant when he filed his first opposition. The court properly excluded Exhibit U as untimely. We do not consider it.

b

We turn now to Carracela's arguments and evidence about notice, relying on his other evidence.

Carracela said Edison had "actual and constructive notice" of the conflict between the Pier T off-ramp demolition work and the line, knew about the location and scheduling of the work, and knew the lines were in close proximity to demolition work. It was "reasonable to infer" Edison's field representatives saw the work on the days leading to his injury and on the date of his injury. Edison "knew or should have known that such work necessarily included manlifts and heavy equipment in close proximity" to the line.

Carracela's amended opposition included many citations but failed to demonstrate a disputed material fact.

An overarching problem with Carracela's presentation is its basis in speculation and guesswork, which makes it insufficient to create a material factual dispute. (*Joseph E. Di Loreto, Inc. v. O'Neill* (1991) 1 Cal.App.4th 149, 161.)

His evidence fits in five main categories, which we now treat.

First, Carracela offered evidence that Edison, before Carracela's accident, knew the line was supposed to be relocated underground. The lines were "in conflict with the new bridge installation or in conflict with the new proposed on-ramp, off-ramp for the new bridge." The relocation was delayed because

19

the Port or general contractor had not built the underground structures to house the lines.

This evidence did not create a material factual dispute about Edison's knowledge that workers were using 80-foot lifts for demolition in that area at that time. It merely showed Edison planned to move its line and had not yet done so.

Carracela's second type of evidence, that Edison attended meetings and was sometimes at the worksite, also fails to create a disputed material fact.

We summarize this evidence. Jesus Enriquez, an Edison transmission planner, George Perez, an Edison project manager, Bruce Cason, an Edison distribution planner, and Lam attended weekly meetings with the general contractor and the Port. The purpose of the meetings was to discuss plans and to avoid future construction issues by mitigating conflicts. After construction work began, they discussed the progress of that work. Perez said they tracked "all the different work," of the project, including construction and demolition. They tracked "in general" where workers were.

Cason said he and others on the Edison team would ride around the project area after weekly meetings. On the rides, he would look at the status of the work to see if construction had started and "just generally" to watch the bridge going up. If he saw workers too close to lines, he would let them know.

Salvatore Davi, an Edison underground civil inspector, attended a pre-construction meeting on July 24, 2013, the day of Carracela's accident. Davi's job was to inspect underground installations. In July 2013, he had not yet begun this work. The meeting was to verify Davi and the general contractor had the same drawings, which the general contractor would use to install

20

underground conduits and which Davi would use to inspect the conduits.  Later in the deposition, Davi said the meeting was to inspect the conduit that was going to go underground.  Davi initially could not recall whether the July 24 meeting was at the bridge worksite but later agreed it was somewhere on the bridge project site and possibly at a trailer.  The underground conduits he would be inspecting would be used to put the lines underground, including the line that injured Carracela.

This evidence does not create a material fact.  The evidence of Enriquez, Perez, Cason, and Lam at most showed Edison had a general awareness about the goings-on at the large project site.  No one said they knew workers were using 80-foot lifts for demolition in that area at that time.  The evidence was Cason would have talked to workers if he saw them close to the line, but no evidence shows he saw this at Pier T.  Furthermore, Davi's job was inspecting underground installations.  Even had he been near the Pier T site on July 24, this would not establish Edison's knowledge of aerial construction work.

Carracela suggests Davi was at the site and must have been there before the accident.  This is speculation.

This second type of evidence thus did not create a material fact.

The third type of evidence is that an overarching goal of the meetings was to identify and resolve conflicts between existing utilities and planned construction.  Carracela says this creates an issue of fact about notice.  His speculation that broad goals created specific notice does not, however, create an issue of fact.

The fourth type of evidence, that Lam and Enriquez generally knew demolition was occurring, also does not create a material fact.  Enriquez agreed he was aware when the

demolition of the Pier T off-ramp began. Lam knew, as of July 15, 2013, that workers would be demolishing the Pier T off-ramp. He was aware Edison transmission and distribution lines were "within [the] vicinity" of the demolition work that workers were going to perform. General awareness about the demolition does not create a disputed material fact. Enriquez and Lam did not know workers were using 80-foot lifts for demolition in that area and could not foresee such a lift would be used and raised toward the high-voltage 60-foot line.

The fifth area of evidence is Edison's own construction, which also fails to create a disputed material fact. Edison installed conductors in an area southeast of the Pier T off-ramp in July 2013. Construction in the area does not show Edison knew about the specifics of the work Carracela was performing. This evidence does not create a disputed material fact.

Carracela suggests this case is like *Dunn v. Pacific Gas & Electric Co.* (1954) 43 Cal.2d 265 (*Dunn*), but that is incorrect. In *Dunn*, the Supreme Court reversed a nonsuit judgment, ruling a factfinder should decide whether a power company unreasonably delayed in correcting a known danger. (*Id.* at p. 277.) The *Dunn* power company's notice and the height of the line at issue distinguish this case.

Austin Dunn and others worked for a park district to fill and level an area to prepare it for construction. (*Dunn, supra,* 43 Cal.2d at p. 269.) This work raised the ground level and decreased a high voltage power line's clearance to 12 and a half feet. (*Ibid.*) This clearance violated General Order 95's height requirements and created a generally " 'dangerous condition.' " (*Id.* at p. 272.) A foreman of the power company and a supervisor of the electric company's pole and transmission line department

22

observed the condition and warned workers not to go under the lines.  (*Id*. at pp. 269–270.)  The next day, Dunn was electrocuted after a dump truck touched the line.  (*Id*. at pp. 269, 271.)

The power company said it did not breach a duty of care but the court disagreed.  *Dunn* distinguished cases like *Pascoe v. Southern Cal. Edison Co.* (1951) 102 Cal.App.2d 254 and *Hayden v. Paramount Productions, Inc.* (1939) 33 Cal.App.2d 287, in which the defendants "had no reason to anticipate danger" or else had no duty to make changes.  (*Dunn*, *supra*, 43 Cal.2d at p. 277.)  In *Dunn*, the power company knew about changed circumstances that created a generally dangerous condition, so it had a duty to place its wires in a safe condition under the changed circumstances.

This case is different.  It involves wires over three times higher than those in *Dunn*.  The wires complied with the General Order's height requirements.  If there was a generally "dangerous condition," there is no proof Edison knew about it.

### DISPOSITION

The judgment is affirmed.  We award costs to Edison.


WILEY, J.


We concur:



STRATTON, Acting P. J.            CURREY, J.*

---

*        Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

23